# RAMSPECK ET AL. *v.* FEDERAL TRIAL EXAMINERS CONFERENCE ET AL.

No. 278.   Argued January 9, 12, 1953.—Decided March 9, 1953.

*Robert W. Ginnane* argued the cause for petitioners. With him on the brief was *Solicitor General Cummings.*

*Charles S. Rhyne* argued the cause for respondents. With him on the brief was *Eugene J. Bradley.*

*Richard S. Doyle* and *Donald C. Beelar* filed a brief for the Bar Association of the District of Columbia, Inc., as *amicus curiae,* urging affirmance.

MR. JUSTICE MINTON delivered the opinion of the Court.

The present suit was brought by the Federal Trial Examiners Conference,[1] an unincorporated association of trial examiners, and by a number of individual trial examiners, against the members of the United States Civil Service Commission and the National Labor Relations Board. The plaintiffs, who had been appointed pursuant to § 11 of the Administrative Procedure Act, 60 Stat. 244, 5 U. S. C. § 1010, sought a declaratory judgment that certain rules relating to their promotion, compensation, tenure, and the assignment of cases, promulgated by the Civil Service Commission pursuant to § 11, were invalid, and asked that their enforcement be enjoined. The District Court held that these four rules were invalid, interpreting § 11 as requiring: (1) that

---

[1] Since the question was not raised before us, we do not rule on the standing of the Federal Trial Examiners Conference to be a party in this suit.

hearing examiners employed by a particular federal administrative agency must be placed in the same salary grade; (2) that a hearing examiner may not be promoted from one salary grade to another within the same agency; (3) that hearing examiners must be assigned to cases in mechanical rotation without regard to the difficulty or importance of particular cases or the competence or experience of particular examiners; and (4) that the employment of hearing examiners may not be terminated by reduction in force procedures where there is a lack of work or of funds with which to pay them. The District Court granted a permanent injunction against the enforcement of these four Civil Service rules, 104 F. Supp. 734. The Court of Appeals affirmed in a short per curiam opinion, one judge dissenting. 91 U. S. App. D. C. 164, 202 F. 2d 312. We granted certiorari, 344 U. S. 853.

Prior to the passage of the Administrative Procedure Act, hearing examiners' tenure and status were governed by the Classification Act of 1923, as amended. Under the Classification Act, as employees of an agency, their classification was determined by the ratings given them by the agency, and their compensation and promotion depended upon their classification. The examiners were in a dependent status.

With the rapid growth of administrative law in the last few decades, the role of these quasi-judicial officers became increasingly significant and controversial. Many of the regulatory powers which Congress has assigned federal administrative agencies can be exercised only after notice and hearing required by the Constitution or by statute. These agencies have such a volume of business, including cases in which a hearing is required, that the agency heads, the members of boards or commissions, can rarely preside over hearings in which evidence is required. The agencies met this problem long before

the Administrative Procedure Act by designating hearing or trial examiners to preside over hearings for the reception of evidence. Such an examiner generally made a report to the agency setting forth proposed findings of fact and recommended action. The parties could address to the agency exceptions to the findings, and, after receiving briefs and hearing oral argument, the agency heads would make the final decision.

Many complaints were voiced against the actions of the hearing examiners, it being charged that they were mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and recommendations. A study by President Roosevelt's Committee on Administrative Management resulted in a report in 1937 recommending separation of adjudicatory functions and personnel from investigative and prosecution personnel in the agencies. The Attorney General's Committee on Administrative Procedure was appointed in 1939 to study the decisional process in administrative agencies, and the final report of this Committee was published in 1941. Both the majority and minority members of the Committee recommended that hearing examiners be made partially independent of the agency by which they were employed; the majority recommended hearing examiners be appointed for a term of seven years, and the minority recommended a term of twelve years. Although extensive hearings were held on bills to carry out the recommendations of this Committee, World War II delayed final congressional action on the subject. After the war, the McCarran-Sumners Bill, which became the Administrative Procedure Act, was introduced. The Senate Judiciary Committee Print of June 1945 reveals that at that time there was still great diversity of opinion as to how the status of hearing examiners should be enhanced. Several proposals were considered, and in the final bill Congress provided that

hearing examiners should be given independence and tenure within the existing Civil Service system.[2]

Congress intended to make hearing examiners "a special class of semi-independent subordinate hearing officers"[3] by vesting control of their compensation, promotion and tenure in the Civil Service Commission to a much greater extent than in the case of other federal employees. Section 11 is as follows:

"Subject to the civil-service and other laws to the extent not inconsistent with this Act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners. Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission (hereinafter called the Commission) after opportunity for hearing and upon the record thereof. Examiners shall receive compensation prescribed by the Commission independently of agency recom-

---

[2] The Senate Report described the alternatives before the Congress and the purpose of § 11 as follows:

"The purpose of this section is to render examiners independent and secure in their tenure and compensation. The section thus takes a different ground than the present situation, in which examiners are mere employees of an agency, and other proposals for a completely separate 'examiners' pool' from which agencies might draw for hearing officers. Recognizing that the entire tradition of the Civil Service Commission is directed toward security of tenure, it seems wise to put that tradition to use in the present case. However, additional powers are conferred upon the Commission." Administrative Procedure Act—Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess., p. 215.

[3] Legislative History, p. 192.

mendations or ratings and in accordance with the Classification Act of 1923, as amended, except that the provisions of paragraphs (2) and (3) of subsection (b) of section 7 of said Act, as amended, and the provisions of section 9 of said Act, as amended, shall not be applicable. Agencies occasionally or temporarily insufficiently staffed may utilize examiners selected by the Commission from and with the consent of other agencies. For the purposes of this section, the Commission is authorized to make investigations, require reports by agencies, issue reports, including an annual report to the Congress, promulgate rules, appoint such advisory committees as may be deemed necessary, recommend legislation, subpena witnesses or records, and pay witness fees as established for the United States courts."

An examination of § 11 shows that Congress retained the examiners as classified Civil Service employees but made inapplicable to them paragraphs (2) and (3) of subsection (b) of § 7 of the Classification Act and § 9 of that Act. These sections had made the examiners dependent upon the agencies' ratings for their classification. Freed from this dependence upon the agencies, the examiners were specifically declared to be otherwise under the other provisions of the Classification Act of 1923 as amended (now the Classification Act of 1949, 5 U. S. C. (Supp. V) § 1071 *et seq.*).

The position of hearing examiners is not a constitutionally protected position. It is a creature of congressional enactment. The respondents have no vested right to positions as examiners. They hold their posts by such tenure as Congress sees fit to give them. Their positions may be regulated completely by Congress, or Congress may delegate the exercise of its regulatory power, under proper standards, to the Civil Service Commission, which it has done in this case.

134

The question we have presented is whether the Civil Service Commission in the adoption of these rules followed or departed from the directions given it by § 11 of the Administrative Procedure Act. Did it implement the statute, or did it enlarge it?

Respondents do not contend that *all* hearing examiners should be classified in the same grade; they contend only that all hearing examiners *in any one agency* should be classified in the same grade. Petitioners argue that cases in a given agency are of varying levels of difficulty and importance and that the examiners hearing them must possess varying degrees of competency and types of qualifications. Petitioners point to the experience of the Civil Aeronautics Board where there are safety cases heard by one group of examiners and economic cases heard by another. The examiners assigned to the safety cases have pilots' certificates, while those assigned to the economic cases have completely different types of qualifications. Again, certain cases before the Interstate Commerce Commission involve relatively simple applications for extensions of motor carrier certificates, while others involve complicated and difficult railroad rate proceedings. Petitioners' argument indicates the need for specialization among examiners in the same agency to meet the diverse types of cases presented.

Proceeding under the provisions of the Classification Act, the Commission still classified the examiners according to their experience, skill, and ability,[4] but without seeking or receiving rating of the examiners by the

[4] Section 11 of the Administrative Procedure Act became effective June 11, 1947, one year after the Act's approval. The Commission accepted the examiner positions in the five different grades established by the agencies. After notice and hearing, regulations were promulgated on September 23, 1947. The Commission appointed a Board of Examiners from outside the Government to pass on the qualifications of incumbent status examiners, and to conduct a com-

agencies and wholly independent thereof. A classification of the examiners into grades, with salaries appropriate to each grade, was set up by the Commission in each federal agency using examiners. This classification ranged from just one grade in several agencies to five grades in two agencies. Allocation of examiners in accordance with these classifications is provided for in Rule 34.10 [5] which specifically states, "Allocations *shall* be made independently of agency recommendations and ratings." (Emphasis supplied.)

When the Commission classified the examiners according to the Classification Act, it was doing just what Congress directed it to do. As has been previously shown, § 11 specifically directs that "Examiners shall re-

petitive examination for nonstatus incumbents and new applicants. When the results were announced in March 1949, 25.5% of the 212 status incumbents rated by the Board were found disqualified, but appeals were taken and ultimately all were found qualified. The action of the Board of Examiners was much criticized. See Thomas, *The Selection of Federal Hearing Examiners: Pressure Groups and the Administrative Process* (1950), 59 Yale L. J. 431, 433; Fuchs, *The Hearing Examiner Fiasco Under the Administrative Procedure Act* (1950), 63 Harv. L. Rev. 737, 767. Meanwhile, dispute had arisen as to what part the agencies had in the promotion of examiners—the existing regulations permitted the agency to select the examiner to be promoted subject to the retroactive approval of the Commission. On February 23, 1951, the Attorney General issued an opinion holding the promotion regulation invalid. 41 Op. Atty. Gen., No. 14. On September 21, 1951, the Commission promulgated the present regulations involved in this suit.

[5] "§ 34.10 *Compensation*. (a) Hearing examiner positions shall be allocated by the Commission in accordance with the regulations and procedures adopted by the Commission for allocations under the Classification Act of 1949. Allocations shall be made independently of agency recommendations and ratings.

"(b) Hearing examiners shall receive within-grade salary advancements in accordance with Part 25 of this chapter: *Provided,* That the requirement of a satisfactory or better performance rating shall not apply." 5 CFR, 1951 Supp., § 34.10.

ceive compensation . . . in accordance with the Classification Act of 1923, as amended," with the exception provided in the statute and in the rules that this is to be done independently of agency influence. This contradicts the contention that Congress did not intend to permit classification of examiner positions by the Commission. The Act clearly provides, as Congress thought it did,[6] for the allocation of positions within an agency to be made in various salary grades, which reflect the competence and experience of the person in the grade. Congress must have recognized the right of the Commission so to classify when it amended the Classification Act in 1949. At that time it specifically excluded thirty-two categories of government employees, but not examiners, 5 U. S. C. (Supp. V) § 1082, although the Commission then was classifying examiners under regulations similar to the present ones.

The District Court was critical of the specifications used by the Commission to classify the examiners as being "nebulous and subjective." To classify the positions into the different grades from GS 11 to GS 15, the Commission used specifications as to job content as "moderately difficult and important," "difficult and important," "unusually difficult and important," "exceed-

---

[6] "In the matter of examiners' compensation the section adds greatly to the Commission's powers and function. It must prescribe and adjust examiners' salaries, independently of agency ratings and recommendations. The stated inapplicability of specified sections of the Classification Act carries into effect that authority. The Commission would exercise its powers by classifying examiners' positions and, upon customary examination through its agents, shift examiners to superior classifications or higher grades as their experience and duties may require. The Commission might consult the agency, as it now does in setting up positions or reclassifying positions, but it would act upon its own responsibility and with the objects of the bill in mind." Legislative History, p. 215 (Senate Report). See also pp. 280–281 (House Report).

ingly difficult and important," and "exceptionally difficult and important." These specifications of necessity must be subjective. They are not based so much on evidence as on judgment. It is a discriminating judgment and one Congress committed to the experience and expertise of the Civil Service Commission, not the courts. The specifications evidently had practical content and meaning to Congress, as it repeatedly used similar phrases to describe relative methods in § 602 of the Classification Act of 1949, 5 U. S. C. (Supp. V) § 1112.

We come next to Rule 34.4 of the Commission relating to promotions,[7] which is set forth in the margin. This

---

[7] "§ 34.4 *Promotion*—(a) *From a hearing examiner position.* When an agency decides that a hearing examiner position should be filled by the promotion of one of its hearing examiners, the Commission will select the examiner who is to be promoted. To be eligible to compete for promotion, hearing examiners must be serving in the agency, in the area of competition designated by the Commission, under absolute appointments, in grades lower than the position to be filled. In addition, hearing examiners must meet the current recruiting standards (including the requirement of at least one year of experience of a level of difficulty comparable to that of the next lower grade). After examining the qualifications of all candidates, the Commission will select the best qualified. The hearing examiner selected by the Commission must be promoted not later than the beginning of the second pay period following the period in which the Commission's decision is reached, unless the Commission directs that the promotion be delayed pending adjudication of appeals. Once an agency elects to have a position filled by promotion and the Commission undertakes an examination to fill the position, the hearing examiner selected by the Commission must be promoted.

"(b) *From a position other than a hearing examiner position.* When an agency desires to fill a vacancy in a hearing examiner position by the promotion of an employee who is serving in a position other than a hearing examiner position, with competitive status but without absolute status as a hearing examiner, it shall submit the name of the person to the Commission with an application form executed by him. The Commission will rate the qualifications of the applicant in

rule was held invalid by the District Court, consistent with its view that there can be no classification of examiners and therefore there can be only one grade. Since we disagree with the court below as to the right of the Commission to classify examiners into grades within an agency and hold that such classification can be made, it must follow that promotions from one grade to another may be made.

But respondents also challenge the *method* by which promotions are made. The rule provides that the agency shall decide if there is a vacancy to be filled, and further that the agency shall decide if this vacancy is to be filled by promotion from among the present examiners. The examiners insist that thus the agency can control and coerce its examiners, and has an absolute veto power over promotions. But it is the Commission which chooses the examiner who shall receive the promotion. Respondents imagine all sorts of devious schemes by which the agencies shrewdly analyze their staffs to pick out which examiners would probably be chosen by the Commission for promotion, and then create vacancies for them as a reward for favorable decisions, or else fill vacancies from outside in order to discipline recalcitrant examiners. Respondents have not shown any actual examples of this, nor do they show that in such circumstances the Commission would not correct the situation. As a practical matter, the Commission must always turn to the agency for advice on the number of examiners needed at the various levels. The statute declares that

---

accordance with the experience and training requirements of the open competitive examination (except the maximum age requirement) including an investigation of character and suitability. If on the basis of the rating assigned, the applicant would be within reach for certification if his name were on the open competitive register with the same rating, the Commission will approve the promotion; otherwise it will disapprove the request." 5 CFR, 1951 Supp., § 34.4.

"there shall be appointed *by and for each agency* as many qualified and competent examiners as may be necessary." (Emphasis supplied.) It then puts sufficient responsibility in the Commission's hands to ensure independent judgments from the examiners. It does not reduce the responsibility of the agency to see that it has a sufficient number of competent examiners to handle its business properly.

We come next to Rule 34.12, Rotation of Examiners. It provides:

> "Insofar as practicable, examiners shall be assigned in rotation to cases of the level of difficulty and importance that are normally assigned to positions of the salary grade they hold." 5 CFR, 1951 Supp., § 34.12.

This rule purports to implement the provision of § 11 that examiners "shall be assigned to cases in rotation *so far as practicable*." (Emphasis supplied.) The respondents contend that this means mechanical rotation—that a case must be assigned to an examiner when his name comes up on the register, unless he is on leave or sick or disqualified or has not completed another assignment, etc. The lower courts accepted the respondents' view and held Rule 34.12 invalid.

The Commission gave to § 11's requirement of assignment of cases in rotation "so far as practicable" consideration beyond the mere mechanics of bringing the next case on the docket opposite the top name on the register of available examiners. It gave consideration to the kind of case involved as well as the kind of examiner available. The Commission had classified the examiners on that basis, and it considered it was practicable to assign cases to examiners who were, according to their classification, qualified to handle the case at hand, having regard to the complexity and difficulty

thereof, together with the experience and ability of the examiner available. If assigned by mechanical rotation, the value and use of such classification, which Congress had authorized, would be lost. To use the classification, it was not practicable to use mechanical rotation. Congress did not provide for the classification of examiners by the Commission, and then provide for the Commission to ignore such classification by a mechanical rotation. The rotation for practical reasons was adjusted to the classifications. This was an allowable judgment by the Commission as to what was practicable.

Finally, we come to the consideration of Rule 34.15,[8] which provides for a reduction in force of examiners

---

[8] "§ 34.15  *Reductions in force*—(a) *Retention credits.* Retention credits for purposes of reductions in the force of hearing examiners are credits for length of service in determining retention order in each retention subgroup. They are computed by allowing one point for each full year of Federal Government service.

"(b) *Retention preference, classification.* For the purpose of determining relative retention preference in reduction in force, hearing examiners shall be classified according to tenure of employment in competitive retention groups and subgroups in the manner prescribed in § 20.3 of the Retention Preference Regulations for Use in Reductions in Force (Part 20 of this chapter): *Provided,* That no distinction will be made in subgroups on the basis of a satisfactory or better performance rating as opposed to performance ratings of less than satisfactory.

"(c) *Status of hearing examiners who are reached in reduction in force.* When a hearing examiner has been separated, furloughed, or reduced in rank or compensation because of a reduction in force, his name shall be placed at the top of the open competitive register for the grade in which he formerly served and for all lower grades. Where more than one hearing examiner is affected, the qualifications of the several hearing examiners shall be rated by the Commission and relative standing at the top of the register will be on the basis of these ratings.

"(d) *Appeals.* (1) Any hearing examiner who feels that there has been a violation of his rights under the regulations governing reductions in force may appeal to the Commission (attention, Chief Law

under circumstances governing the reduction in force of
other federal employees. Respondents' contention, sus-
tained by the courts below, is that the provision of § 11
that examiners "shall be removable . . . only for good

---

Officer) within 10 days from the date he received his notice of the
action to be taken.

"(2) Each appeal shall state clearly the grounds on which it is
based, whether error in the records; violation of the rule of selection;
restriction of the competitive area or level; disregard of a specified
right under the law or regulations; or denial of the right to examine
the regulations, retention register, or records.

"(3) The agency in which the hearing examiner is employed shall
be notified of the appeal and shall be allowed to file an answer thereto.
The agency's answer must be submitted to the Commission's Chief
Law Officer within 10 days from the date the agency is notified.

"(4) Upon receipt of an appeal the Chief Law Officer will refer the
case to the Personnel Classification Division for investigation. The
Personnel Classification Division will make investigation and submit
its report to the Chief Law Officer. If the investigation discloses
violations of the rights of the appellant, the Chief Law Officer shall
notify the agency as to the corrective action to be taken. The
agency may appeal the decision of the Chief Law Officer within 10
days of its receipt to the Commission's Board of Appeals and Re-
view. If the Board of Appeals and Review disagrees with the decision
of the Chief Law Officer, it shall refer the case to the Commission's
Chief Hearing Examiner for a hearing in accordance with subpara-
graph (5) of this paragraph.

"(5) Appeals in which the Chief Law Officer cannot make initial
finding in favor of the appellant shall be referred to the Commission's
Chief Hearing Examiner for a hearing. The hearing shall be con-
ducted in accordance with the provisions of the Administrative Pro-
cedure Act. The appellant, the agency concerned, and the Commis-
sion's Chief Law Officer may be represented at the hearing. Upon
completion of the hearing the presiding hearing examiner shall trans-
mit the entire file with his recommended decision to the Commission
for decision.

"(e) *Retention preference regulations.* The Retention Preference
Regulations for Use in Reductions in Force (Part 20 of this chapter),
except as modified by this section, shall apply to reductions in the
force of hearing examiners."

cause established and determined by the Civil Service Commission . . . after opportunity for hearing and upon the record thereof" gives them a lifetime position, subject to removal only for cause, and that the reduction in force procedures of the Commission have no application to them.

In this, we think the respondents are mistaken. Congress intended to provide tenure for the examiners in the tradition of the Civil Service Commission. They were not to be paid, promoted, or discharged at the whim or caprice of the agency or for political reasons. One of the individual examiners suing here was discharged by the Labor Board for lack of funds. The Commission has traditionally provided for a reduction in force for lack of funds, personnel ceilings, reorganizations, decrease of work, and similar reasons. 5 CFR, 1951 Supp., § 20.2 (a).

Part of respondents' argument seems to direct itself to the point that it is the agency which makes the reduction in force. Rule 34.15 provides for the dropping of examiners with the lowest number of "retention credits" after the agency finds that it must reduce its force. These credits are based on length of service and are beyond the power of the agency to affect. As with promotions, the Commission will always need to consult with the agency to ascertain that there is occasion for a reduction. Just as the statute leaves with the agency the duty to see that there are an adequate number of the right type of examiners, it leaves with the agency the responsibility to declare that there are a lesser number of examiners necessary at this time. It must be assumed that the Commission will prevent any devious practice by an agency which would abuse this Rule. The Rule provides for examiner appeal to the Commission, so there is opportunity to bring abuses to the Commission's attention. Also challenged is the statement in the

Retention Preference Regulations for Reduction in Force (5 CFR, 1951, § 20.2) allowing reduction in force "for other reasons." This is obviously to provide for legitimate reasons for reduction not now foreseen, and it must be assumed that the Commission will not permit an agency to misuse it.

We find no evidence that Congress intended to make hearing examiners a class with lifetime employment, whether there was work for them to do or not, as contended by the respondents. A reduction in force for the reasons heretofore provided by the Civil Service Commission and removal of an examiner in accordance therewith is "good cause" within the meaning of § 11.

The rules conform to the statute and carry out the purpose and intent [9] of Congress, and they are therefore valid.

The judgment is reversed, and the cause is remanded to the District Court with directions to dismiss the complaint.

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE DOUGLAS concur, dissenting.

I think these regulations should be held invalid and the judgment affirmed for substantially the reasons given in the opinion of Chief Judge Laws of the District Court for the District of Columbia. 104 F. Supp. 734. I wish

---

[9] Respondents' brief and the dissenting opinion filed herein quote a sentence from a letter of September 6, 1951, from Senator McCarran, Chairman of the Senate Judiciary Committee, to Chairman Ramspeck of the Civil Service Commission, as follows: "It was intended that [examiners] be very nearly the equivalent of judges even though operating within the Federal system of administrative justice." S. Doc. No. 82, 82d Cong., 1st Sess., p. 9. We do not feel justified in regarding this sentence, taken out of context and written over five years after the Administrative Procedure Act was enacted, as illustrative of the intent of Congress at the time it passed the Act.

to add a few words merely to emphasize certain aspects of that opinion.

The Administrative Procedure Act was designed to give trial examiners in the various administrative agencies a new status of freedom from agency control. Henceforth they were to be "very nearly the equivalent of judges even though operating within the Federal system of administrative justice."[1] Agencies were stripped of power to remove examiners working with them. Henceforth removal could be effected only after hearings by the Civil Service Commission. That same Commission was empowered to prescribe an examiner's compensation independently of recommendations or ratings by the agency in which the examiner worked. And to deprive regulatory agencies of all power to pick particular examiners for particular cases, § 11 of the Act commanded that examiners be "assigned to cases in rotation so far as practicable . . . ." I agree with the District Court and the Court of Appeals that the regulations here sustained go a long way toward frustrating the purposes of Congress to give examiners independence.[2]

Section 11 of the Administrative Procedure Act, as pointed out, provides that examiners may be removed "only for good cause established" after hearings. One of the regulations here approved authorizes their removal when an agency finds it necessary to reduce its force. We have been pointed to no act of Congress which justifies this regulation.

Another regulation here approved permits the assignment of cases to examiners by "classification" instead of by "rotation" as § 11 requires. I do not agree with the Court that the Classification Act of 1923 or any other

---

[1] S. Doc. No. 82, 82d Cong., 1st Sess. 9.

[2] Support of the foregoing statements as to the purpose of the Act can be found in *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, and in the opinion of Chief Judge Laws, 104 F. Supp. 734.

act of Congress authorizes the distinctions here made between examiners. In fact, the Administrative Procedure Act appears to contemplate that all examiners employed by a particular agency stand on equal footing in regard to service and pay. A central objective was to prevent agency heads from using powers over assignments to influence cases. Unlimited discretion in assignment would lead to subservient examiners, it was thought. But the effect of the Civil Service classifications is to restore the unlimited discretion existing before passage of the Administrative Procedure Act.

The distinctions depended upon to support the different classifications are so nebulous that the head of an agency is left practically free to select any examiner he chooses for any case he chooses. For the regulations permit the head of an agency to assign a particular case on the basis of whether the head of the agency believes it to be "moderately difficult and important," "difficult and important," "unusually difficult and important," "exceedingly difficult and important," or "exceptionally difficult and important." And administrative agencies are permitted to attribute choice of a particular examiner for a particular case to considerations whether "complex legal, economic, financial or technical questions or matters" are merely "moderately complex," "fairly complex," "extremely complex," "exceptionally complex," or just "complex." I think all these conceptualistic distinctions mean is that the congressional command for a nonagency controlled rotation of cases is buried under words.