**Jerry E. TODD et al., Plaintiffs,**

v.

**Alan K. CAMPBELL, Defendant.**

**Civ. A. No. 77–747.**

United States District Court,
District of Columbia.

Feb. 24, 1978.

James D. Hill, Washington, D. C., for plaintiffs.

Edward S. Christenbury, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

GESELL, District Judge.

Plaintiffs, who number only 33 of the several thousand air traffic controllers employed at various air route traffic control centers,[1] invoke section 10(e) of the Administrative Procedure Act, 5 U.S.C.

§ 706(2)(1976), and seek to set aside the Position-Classification Standard for air traffic controllers issued on January 12, 1977, by the Civil Service Commission. Plaintiffs complain that their classification at Civil Service grade levels GS–12 and GS–13 at the same time that other center air traffic controllers are classified at the GS–14 level is arbitrary, capricious, and not in accordance with various civil service laws. The parties cross-moved for summary judgment, and defendant submitted an administrative record.[2] Full briefs were filed and arguments heard. Review is upon the record. *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 599, 46 L.Ed.2d 533 (1976).

Prior to adoption of the standard in question, full performance air traffic controllers were compensated at the GS–12 or GS–13 levels. The existing standard differentiated between these grades through narrative and conceptual distinctions in key job evaluation factors such as volume of traffic controlled, characteristics of the environment controlled, and level of ability required. In seeking to implement this abstruse standard, the Federal Aviation Administration (FAA) issued a guide attempting to translate the standard's narrative descriptions of volume into specific annual volume criteria for each grade level. As a matter of practice these criteria became the determinants of the grade levels of air traffic controllers.

In August 1975, in response to widespread dissatisfaction by controllers with their classification, the Department of Transportation formally requested development of a new classification standard by the Commission. The Commission staff embarked on a detailed year-long study, armed with the findings of an earlier study of the problem by the FAA and the Professional

---

**1.** Air traffic controllers work generally in one of three kinds of installations: air traffic control terminals, flight service stations, and air route traffic control centers ("centers"). The latter, of which there are 20 in the continental United States, track, assist, and direct en route aircraft operating within an entire region. This case concerns only the classification of these center controllers.

**2.** The record on file represents the fruit of defendant's attempt to reconstruct all material that was before the Commission at the time it rendered its final decision. It appears, however, that the Commission itself never saw some of the submitted material, and as will later appear, record of some of the Commission activities are not included in the submitted record.

Air Traffic Controllers Organization (PAT-CO), the controllers' union and sole bargaining representative. The study culminated in the production of a draft standard on August 31, 1976. The staff found that all centers had a policy of rotating all full performance controllers through tasks of varying complexity, and therefore all controllers within a center should be classified in the same grade. Grade levels GS–12 and GS–13 were again found correctly to reflect controllers' work, with only the more demanding and complex centers warranting the higher level. In analyzing the complexity and demands of the various centers, the staff found only one salient distinguishing factor: the overall volume or density of traffic handled by the center. All other complexity factors either balanced out or were accurately reflected in the volume factor.

The Civil Service Commission has for some time delegated authority to its staff—specifically the Chief of its Standards Division—to publish as well as develop final classification standards. Ordinarily, then, the Commission does not involve itself in the classification process. In this case, however, publication of the draft standard produced an uproar from the controllers, because the proposed standard required widespread downgrading of controllers and did not provide for the promotion of any controllers to the sought-after GS–14 level. Confronted with the threat of widespread slowdowns and heavy union and political pressure, the Commission took over responsibility from its staff and entered into negotiations with FAA, PATCO, and various congressional leaders. The standard that emerged from the Commission as a result of these meetings continued the basic plan of determining the grade of all controllers within an installation by the number of flights handled by that installation, but elevated controllers in the busiest installations to GS–14 and required very little down-grading. Thus under the new standard, controllers in centers handling up to an average of 169 Instrument Flight Rule (IFR) aircraft per hour were to be graded at GS–12; those in centers handling up to 274 IFR aircraft at GS–13; and those in centers handling over 275 at GS–14.[3]

■ Plaintiffs challenge both the substance of the standard and the record upon which it was adopted. Their substantive argument is that with respect to control centers the Commission's reliance on air traffic density or volume is misplaced and arbitrary. Plaintiffs view the overall amount of traffic handled by a center as a meaningless figure. This is because each center is divided into sectors, and each controller is responsible for only one sector at a time. As the amount of traffic handled by a center increases, the center is further subdivided to create more sectors, and more controllers are hired. In other words, if Center X has twice as much traffic as does Center Y, then Center X will have twice as many sectors and twice as many controllers as Center Y. Therefore it is argued that since all full performance center controllers have the same tasks and skills, under 5 U.S.C. § 5101(1)(A) (1976), which mandates "equal pay for substantially equal work," all center controllers must be classified within the same Civil Service grade and the total volume of the center is irrelevant.

The volume criterion relied on by the Commission is not so easily dismissed. It is quite clear from the administrative record that both the Commission and its staff considered and rejected plaintiffs' argument. Intensive field investigation convinced the Commission staff that, independent of the number of controllers assigned to a center, the volume handled by a center enhances the risks, pressures, and demands of the controller's work. The Commission affirmed this finding in the final standard:

**3.** The Commission was careful to point out, however, that the grade level of controllers who did not rotate through various positions so that their work reflected the overall complexity of the center in which they worked would have to be evaluated on an individual basis. U. S. Civil Service Commission, Position-Classification Standard for Air Traffic Controller Series 53–54 (1977).

A significant increase in center traffic affects: the level of coordination among the controllers; the criticality of and rapidity with which decisions must be made and actions taken; the degree to which optional plans for the movement and control of aircraft are reduced; and the complexity of the control procedures required.[4]

The Commission's acceptance of these self-evident facts was in no sense arbitrary. Under 5 U.S.C. § 5106(b) (1976) the Commission must base its determination of the appropriate grade on "the level of difficulty, responsibility, and qualification requirements of the work of the class." Having found that center air traffic controllers encounter more difficulty and assume added responsibility as the volume of traffic in the center through which they are rotated increases, the Commission was not only rational in distinguishing between the work of controllers at different centers based on volume, but was obligated to do so. *See generally White v. United States Civil Service Commission,* 468 F.2d 1357 (9th Cir. 1972).[5]

▇ Plaintiffs attack also the state of the record. The Commission staff conducted extensive field investigation and analysis in its preparation of the draft standard. Yet the data and reports that must have been produced are nowhere found in the record, and from this plaintiffs deduce two shortcomings. First, since the record purportedly contains all the information laid before the Commission by its staff, it is urged that the Commission acted arbitrarily because it could not have been informed as to the facts underlying the staff recommendations. By the same token, plaintiffs argue, since the Court too is without access to that data, it lacks the basis upon which to judge the rationality of the Commission's decision.

Neither argument will withstand analysis. The Commission has chosen, as indeed it must, given the magnitude of its task, to delegate much of its responsibility to its staff, and in this case as in others it has chosen to rely upon the analysis provided it. Had the staff formulated its draft without consideration of the facts, then the standard could clearly be termed arbitrary. But this is not alleged to have been the case. The staff recommendations to the Commission are replete with detail sufficient to alert the Commission to the self-evident underlying factual data and the nature of the judgment decisions to be made. There was no need for the Commission to have seen the data itself. For much the same reason the Court does not need to examine the raw data in order to determine whether or not the Commission decision was arbitrary and capricious or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), upon which plaintiffs rely, requires only that to make this finding "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Accord, e. g., Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). There is no general requirement that the agency include in the record the data underlying each factor, and this is as true in cases involving review of Commission action as much as any other. *See generally Ramspeck v. Federal Trial Examiners Conference,* 345 U.S. 128, 136–37, 73 S.Ct. 570, 97 L.Ed. 872 (1953).[6] Here the Commission stated in plain terms both

---

**4.** *Id.* at 50.

**5.** Plaintiffs claim also that even if volume is a relevant criterion, it is nonetheless meaningless to rely upon total center volume, since each controller is only affected by the volume of traffic in his sector, and the characteristics of each sector within a center varies. Both the staff and the Commission found, however, that

each controller was rotated through different sectors in such a way that the work of each is representative of the overall average complexity of the center as a whole.

**6.** The only cited case with dicta to the contrary is *Barrett Mobile Home Transport, Inc. v. ICC,* 567 F.2d 150 at 152 (D.C.Cir. 1977), in which it was stated: "While we realize that the Com-

its determination to employ volume as the determinative criterion in grading and the factors it considered in reaching its decision. In any event, the underlying factual basis for each of those factors is, as has been noted, virtually self-evident.

A third alleged defect raised is somewhat troubling. After receiving the staff recommendations, the Commission itself engaged in negotiations with representatives of PATCO, the FAA, and Congress. No record was made of these meetings, out of which emerged a final standard differing from that recommended by the staff. Acting in an unaccustomed role, the Commission clearly failed to develop a complete administrative record, with the result not only that review has been hampered, but also that the spectre is raised of political intrigue in what has always been intended to be a scrupulously nonpolitical process. The Commission's failure to record its negotiations, however, although regrettable, does not warrant setting aside its final standard, especially given the limited role of the courts in cases involving government employment. *See Keim v. United States,* 177 U.S. 290, 296, 20 S.Ct. 574, 44 L.Ed. 774 (1900). The positions of both the union and the FAA were well recorded, and it is obvious that these positions were simply reinforced during oral communications. That aspect of the standard challenged here was not even altered from the staff recommendation as a result of the negotiation process.[7]

Defendant's motion for summary judgment is granted and plaintiffs' denied.

mission must be given great leeway in dealing with applications for temporary authority, we must admonish once again that decisions unsupported by relevant data are simply arbitrary." That case, however, dealt with an ICC regulation specifically requiring the submission to the record of data supporting the grant of temporary operating authority. Here, no such regulation is being violated.

7. Indeed it is somewhat curious to hear plaintiffs complain at all about the negotiating process that occurred after submission of the draft standard, since all of the changes that resulted from the negotiations favored the air traffic controllers.