**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

DAVID F. BANDIMERE,

    Petitioner,

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

    Respondent.

_____

IRONRIDGE GLOBAL IV, LTD;
IRONRIDGE GLOBAL PARTNERS,
LLC,

    Amici Curiae.

No. 15-9586

_____

**ORDER**
_____

Before **TYMKOVICH**, Chief Judge, **KELLY**, **BRISCOE**, **LUCERO**, **HARTZ**,
**HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **MCHUGH**, and **MORITZ**,
Circuit Judges.
_____

This matter is before the court on the Security and Exchange Commission's

_Petition for Rehearing or Rehearing En Banc_. We also have a response from the

petitioner. Upon consideration, the request for panel rehearing is denied by a majority of

the original panel members.

The petition and response were also transmitted to all the judges of the court who are in regular active service. Upon that circulation, a poll was called. A majority voted to deny en banc reconsideration. *See* Fed. R. App. P. 35(a).  Consequently, the en banc request is likewise denied.

Judges Lucero and Moritz voted to grant en banc rehearing. Judge Lucero has written separately in dissent, in which Judge Moritz joins.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

15-9586, <u>Bandimere v. U.S. SEC</u>
**LUCERO**, J., joined by **MORITZ**, J., dissenting from the denial of rehearing en banc.

Because this request for rehearing en banc presents numerous questions of constitutional importance, it is my view that we should rehear the matter. First, the panel majority opinion fails to accord proper deference to the constitutional structure of checks and balances and agency separation of functions that flow from that fundamental construct. Second, the panel decision needlessly and improvidently expands the reach of <u>Freytag v. Commissioner</u>, 501 U.S. 868 (1991), which involved judges on the Tax Court, to the unrelated issue of agency administrative law judges ("ALJs"). In light of the significant consequences of this decision, it is not our office to expand the holding in <u>Freytag</u>, to the contrary, any such expansion should remain in the sole discretion of the Supreme Court. Third, the impact of this opinion will be substantial, and it presents a threat of disruption throughout our government. Finally, the majority opinion fails to respect the carefully crafted procedural protections that are incorporated in the Administrative Procedure Act ("APA"), an essential condition of the congressional delegation of authority to administrative agencies.

For each of these reasons, en banc review is not only appropriate, but necessary. That the Supreme Court may ultimately review this case does not relieve us of our independent obligation to rehear it. For the foregoing reasons, I respectfully dissent from the denial of en banc review.

**I**

As James Madison observed, "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 324 (James Madison) (J. Cooke ed., 1961). To prevent the tyranny against which Madison admonished, the founders crafted a constitutional division of authority among three co-equal branches of government, controlled by a series of checks and balances. The panel opinion in this case not only veers away from that constitutional structure, it aggregates power in administrative agency officials contrary to this Madisonian principle.

In the face of a rapidly growing and largely unregulated body of administrative law during the first half of the twentieth century, and concerns about the commingling of functions within administrative agencies, Congress enacted the APA, which provides governing principles. As observed by Senator Pat McCarran in the foreword to the APA's compiled legislative history, the Act was celebrated as "a comprehensive charter of private liberty and a solemn undertaking of official fairness" that "enunciates and emphasizes the tripartite form of our democracy." Administrative Procedure Act Legislative History, at iii (1946).

The need to maintain separation of functions was felt particularly in the area of agency adjudication, and a significant concern motivating the drafters of the APA was the perceived bias of administrative adjudicators. "Many complaints were voiced against the actions of the hearing examiners, it being charged that they were mere tools of the agency

2

concerned and subservient to the agency heads in making their proposed findings of fact and recommendations." Ramspeck v. Fed. Trial Exam'rs Conference, 345 U.S. 128, 131 (1953).[1] Prior to the APA, hearing examiners were "employees of an agency, their classification was determined by the ratings given them by the agency, and their compensation and promotion depended upon their classification." Ramspeck, 345 U.S. at 130. Accordingly, "[t]he examiners were in a dependent status." Id. As the Supreme Court has long recognized, "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." Humphrey's Ex'r v. United States, 295 U.S. 602, 629 (1935).

A 1937 Report of the President's Committee on Administrative Management cogently articulates the concerns:

> There is a conflict of principle involved in [the agencies'] make-up and functions. They are vested with duties of administration and at the same time they are given important judicial work. The evils resulting from this confusion of principles are insidious and far reaching. Pressures and influences properly enough directed toward officers responsible for formulating and administering policy constitute an unwholesome atmosphere in which to adjudicate private rights. But the mixed duties of the commissions render escape from these subversive influences impossible. Furthermore, the same men are obliged to serve both as prosecutors and as judges. This not only undermines judicial fairness; it weakens public confidence in that fairness. Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings with the Commission, in the role of prosecutor, presented to itself.

S. Rep. No. 79-752 (1945), as reprinted in Administrative Procedure Act Legislative History 189 (quotation and ellipses omitted). In light of these concerns, the APA authors

---

[1] ALJs were previously referred to as "hearing examiners." See Eifler v. Office of Workers' Comp. Programs, 926 F.2d 663, 665 (7th Cir. 1991).

adopted the view that the "commingling of functions of investigation or advocacy with the function of deciding [was] plainly undesirable" and should be remedied by "isolating those who engage in the activity" of adjudication via independent hearing officers. S. Comm. on the Judiciary, 79th Cong., Rep. on Admin. Procedure Act (Comm. Print 1945), as reprinted in Administrative Procedure Act Legislative History 25 (quotation and ellipses omitted).

The majority opinion undermines this well-established structure of ALJ independence, and places the legitimacy of our administrative agencies in serious doubt. Whether SEC ALJs exercise the "significant authority" necessary to constitute inferior officers, Bandimere v. U.S. SEC, 844 F.3d 1168, 1173 (10th Cir. 2016), should be informed not just by their daily duties, but by the independent guardrails of our constitutional structure, to wit, the separation of functions within administrative agencies. The majority opinion notes that the Appointments Clause reflects "both separation of powers and checks and balances" concerns, and "promotes public accountability." Id. at 1172. But my respected colleagues in the majority fail to appreciate that these are the very principles embodied in the current structure and process governing selection of ALJs.

**II**

In light of the very real and substantial consequences, labeling SEC ALJs "inferior officers" for the first time in the near-century of their existence should not be done without a clear mandate from the Supreme Court. As demonstrated by the dissenting panel opinion, any such mandate is far from clear.

4

The Supreme Court case at the heart of this dispute involved special trial judges of the Tax Court, an Article I court, and it did not consider administrative agencies or ALJs. Freytag, 501 U.S. at 870. Thus, the majority opinion greatly expands the reach of that decision by equating those Article I judges with ALJs, intermediate hearing officers adjudicating cases for further agency disposition. The many specific bases for distinguishing SEC ALJs from the special trial judges in Freytag are outlined in detail in the dissenting panel opinion. See Bandimere, 844 F.3d at 1194-98 (McKay, J., dissenting). I will not repeat them here, but I emphatically agree with the dissent that it is far from clear Freytag compels a conclusion that SEC ALJs are inferior officers.

Countless cases have been decided in the decades since the structure of regulatory agencies and commissions was first established. Many more have been decided since the Supreme Court's decision in Freytag. Each of these cases has been decided in the context of the very constitutional provisions at issue in this case, and none has concluded that Freytag should be extended in this manner. As the Supreme Court has advised, "long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions." N.L.R.B. v. Noel Canning, 134 S. Ct. 2550, 2559 (2014) (alteration omitted). Giving little regard to the longstanding practices implicated in this case, the majority opinion places the legitimacy of our administrative agencies in serious doubt, based on little more than three sentences in a decades-old Supreme Court decision. See Bandimere, 844 F.3d at 1175-76 (majority opinion) (citing Freytag, 501 U.S. at 881-82). I must agree with the dissent that, without a clearer

5

mandate from the Supreme Court, we should "prefer the outcome that does the least mischief." Id. at 1201 (McKay, J., dissenting).

**III**

In addition to undermining the constitutional foundations and structure of the SEC, the majority opinion "risks throwing much into confusion," id. at 1200, and is likely to have a substantial and disruptive impact on the daily functioning of administrative agencies. There are currently over 1,500 ALJs working in at least 28 different federal agencies, presiding over hundreds of thousands of agency adjudications each year. See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 586-87, app. C (2010) (Breyer, J., dissenting); Kent Barnett, Resolving the ALJ Quandary, 66 Vand. L. Rev. 797, 799 (2013). Despite the majority's best efforts to cabin its decision to SEC ALJs alone, see Bandimere, 844 F.3d at 1188 (majority opinion), the majority opinion will undoubtedly cause the legitimacy of all federal ALJs to come under attack. Since the issuance of this decision, we have already seen one emergency request for relief from an SEC administrative enforcement proceeding. Kon v. SEC, No. 17-3066 (10th Cir. Mar. 31, 2017) (unpublished). It is only a matter of time before we see broader challenges to the validity of agency action.

Consequently, I share the dissent's concern that the majority opinion will be used to conduct a broader assault on our time-tested administrative system. ALJ insulation from agency control and coercion was a primary goal of the APA. However, a probable consequence of the majority opinion is the loss of ALJ independence and political insulation on multiple levels. In particular, the majority ruling threatens to endanger

6

ALJs' double for-cause protection. In Free Enterprise Fund, the Supreme Court determined that "dual for-cause limitations on the removal" of certain inferior officers is unconstitutional. 561 U.S. at 492. Justice Breyer warned in his dissent that the decision could be extended to ALJs, potentially giving "every losing party before an ALJ . . . grounds to appeal on the basis that the decision entered against him is unconstitutional." Id. at 536, 542-43 (Breyer, J., dissenting). The Free Enterprise Fund majority responded that ALJs are not necessarily inferior officers, thereby providing courts with a clear path to avoid extending its holding to ALJs. See id. at 507 n.10 (majority opinion). The panel majority opinion eliminates that path and brings us one step closer to realizing Justice Breyer's concern.

The panel concurrence suggests other potential avenues that courts might use to avoid making ALJs fully subject to the political pressure of agency heads. See Bandimere, 844 F.3d at 1191 (Briscoe, J., concurring). But on a fundamental level, the consequence of this decision—providing agency heads with the sole power to appoint ALJs of their choosing—threatens the integrity of the ALJ office. Further agency control over ALJs may create an unconstitutional appearance of partiality and implicate serious due process concerns. By pulling on the Appointments Clause thread, the majority opinion threatens to unravel much of our modern regulatory framework. This unraveling is justified on the basis of the discretion enjoyed by ALJs in their day-to-day decisional work. But this fails to recognize that any discretion of the ALJs is subject to final acceptance or review by the agency itself. Any administrative agency discretion

7

exercised by any employee of the agency is always subject to the final decisional discretion vested in the members and heads of agencies.

## IV

As described supra, the APA was thoughtfully constructed to ensure maximum independence for ALJs during their decision-making process, thereby providing an administrative separation of functions that mirrors the constitutional separation of powers. To achieve ALJ impartiality and maintain an intra-agency separation of functions, the APA affirmatively separates the investigative and prosecutorial functions of the agency from its formal adjudicatory functions. It provides that "[a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review." 5 U.S.C. § 554(d). Further, an ALJ may not "be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency." § 554(d)(2). To this end, ALJs are hired through a merit-selection process administered by the Office of Personnel Management, 5 U.S.C. § 1302; 5 C.F.R. § 930.201, and they may be fired only by the Merit Systems Protection Board for good cause, 5 U.S.C. § 7521. Congress enacted these provisions with the express purpose of "render[ing] examiners independent and secure in their tenure and compensation." S. Rep. No. 79-752 (1945), as reprinted in Administrative Procedure Act Legislative History 215.

At the same time, the Act vests ultimate decisional authority and discretion in the agencies themselves, thereby promoting public accountability. See § 557(b) ("On appeal

from or review of the initial decision, the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule.").  In the apt words of the panel dissent, "it is quite clear where the buck stops."  Bandimere, 844 F.3d at 1198 (McKay, J., dissenting).  The discretion exercised by the governing head of an agency unquestionably trumps any authority exercised by the ALJs, satisfying the policy concerns that motivated the Appointments Clause.  Congress' carefully crafted framework thus neatly threads the needle, ensuring integrity in the decision-making process and political accountability as to its outcome.

The majority opinion undoes much of this constitutional structure by failing to respect Congress' delegation of authority to agencies, as contemplated by the agencies' organic acts and the APA, and by scuttling the statutory requirements based on a misreading of Freytag.  The APA was a thoughtfully crafted and hard-fought compromise.  It was under consideration for more than ten years, and "no measure of like character has had the painstaking and detailed study and drafting."  H.R. Rep. No. 79-1980 (1946), as reprinted in Administrative Procedure Act Legislative History 241.  Congress considered multiple different and competing proposals before ultimately adopting the procedure now codified in the APA, id., a procedure that has mandated a specific process for the appointment of ALJs for more than seventy years.

That procedure is observed by the securities laws governing the operations of the SEC, which provide that final adjudicative power rests exclusively in the five members of the Commission itself.  See Bandimere, 844 F.3d at 1197 (summarizing the role of SEC ALJs as mandated by 17 C.F.R. §§ 201.360(a)(1), 201.411(a), & 201.400(a)).  The role

9

of ALJs within the SEC thus exemplifies the model of administrative adjudication that Congress selected and memorialized in the APA. As discussed <u>supra</u>, Congress made specific and deliberate choices to structure the appointment of ALJs in a constitutionally sound manner. The panel majority pays too little deference to those congressional dictates.

<strong>V</strong>

The majority opinion will have an overwhelming impact on the fundamental structure of administrative agencies and the administrative process. A case that grapples with such substantial questions of constitutional law and realigns separation of function principles deserves the consideration of our full court.