**AAACON AUTO TRANSPORT, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Auto Driveaway Co., Intervenor.**

**No. 84–1559.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1986.

Decided June 10, 1986.

Scott T. Johnson and Ralph J. Zola, New York City, for petitioner. Eugene M. Malkin, Morton E. Kiel, New City, N.Y., and Mathew R. Schutz, Three Bridges, N.J., were on brief, for petitioner.

Robert J. Grady, Atty., I.C.C., with whom Robert S. Burk, General Counsel, Henri F. Rush, Deputy General Counsel, I.C.C., Robert B. Nicholson and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

Daniel B. Johnson, Washington, D.C., was on brief, for intervenor.

Before ROBINSON, Chief Judge, and WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Aaacon Auto Transport, Inc. ("Aaacon") challenges the Interstate Commerce Commission's ("ICC" or "Commission") total revocation of its operating authority for willful violation of a cease and desist order. Because we reject all of Aaacon's procedural challenges, and because the revocation decision is supported by overwhelming evidence, the petition for review is denied.

## I. BACKGROUND

In 1966 Aaacon obtained a certificate of public convenience and necessity permitting it to transport *"[u]sed passenger automobiles* in driveaway service in secondary movements, with or without baggage, personal effects, and sporting equipment" with the restriction that the company could not move such automobiles "(1) having a prior movement by rail or water, (2) moving on government bills of lading, or (3) moving to automobile dealers." Joint Appendix ("J.A.") at 1–2. In 1971, the ICC began an investigation to determine whether Aaacon was violating the Interstate Commerce Act or the terms of its certificate. Respondents' Supplemental Appendix ("S.A.") app. A. An initial decision entered in 1973 concluded that Aaacon had violated several provisions of the Act and operated beyond its authority. That decision contained a proposed order specifying ten practices from which Aaacon had to cease and provided that Aaacon's certificate and additional grants of authority called "sub-numbers" thereunder could be suspended or revoked in whole or in part for willful failure to comply with the order. S.A. app. B at 13–16. The Commission affirmed the initial decision in 1976 and entered a general cease and desist order; Aaacon petitioned the ICC for clarification as to whether the 1976 order incorporated the 1973 proposed order but the petition was dismissed. *Aaacon Auto Transport, Inc.*, 124 M.C.C. 493 (1976); S.A. app. C. Aaacon then appealed to the Second Circuit, challenging the evidentiary basis for and scope of the Commission order. That court affirmed the ICC in an unpublished order. S.A. app. F.

In February, 1978, the Commission reopened the investigation for further proceedings to determine whether Aaacon had willfully violated the 1976 cease and desist order. S.A. app. G. Administrative law judge ("ALJ") Benice held sixteen days of non-evidentiary proceedings and then, over the objections of the ICC's Bureau of Investigations and Enforcement, entered an initial decision accepting Aaacon's proposed settlement involving a ten day suspension

and the issuance of a more detailed cease and desist order superseding the 1976 order. S.A. app. H. ALJ Benice feared that the Commission would not revoke Aaacon's operating authority and concluded that the broader and more detailed order would better protect the public and "move [Aaacon] closer to the ultimate revocation of its operating authority in the event that it persists in [its] practices." *Id.* at 1.

The Commission reversed the initial decision and rejected Aaacon's offer of settlement. S.A. app. I. The Commission rejected Aaacon's argument that the detailed provisions of the 1973 proposed cease and desist order had never become effective, concluding that the 1976 order "incorporates *by implication* all the various fine points of the [1973] cease and desist order." *Id.* at 4. The Commission also specified that the Office of Hearings should appoint another examiner to conduct the proceedings on remand because of "the course of events at the 16 days of the hearing already held and the hearing officer's apparent involvement in the settlement negotiations." *Id.* at 6.

Aaacon appealed the Commission's decision to this court, challenging both the "removal" of ALJ Benice and the Commission's holding that its 1976 order had incorporated the provisions of the 1973 proposed cease and desist order by implication. In an unpublished decision dated October 16, 1981, this court found that the Commission's remand of the case to a different ALJ was not a "final order" which could be appealed. S.A. app. K at 3–5. The court noted that Aaacon's claim that the ICC had improperly altered the 1976 order might be reviewable because it would subject Aaacon to new obligations, but concluded that Aaacon's "alteration" argument was barred by *res judicata*. *Id.* at 5–6. The opinion explained that "[e]ven without determining whether the 1976 order in fact incorporated the 1973 order, ... we view petitioner's 'alteration' argument as a semantic attempt to escape the properly pre-clusive effect of the Second Circuit's decision." *Id.* at 6.

In the meantime, the remand proceedings at the Commission had stalled—the case was assigned to a new ALJ in February, 1980, but he retired and the case was not assigned to ALJ Sarbacher until January, 1981. A prehearing conference was held in February, sixty-three days of evidentiary hearings were held in four cities between August, 1981, and May, 1982, briefs were filed in July and August, and an initial decision was entered in February, 1983. ALJ Sarbacher concluded that Aaacon had willfully violated every provision of the 1976 cease and desist order, citing the testimony of 50 public witnesses presented by the Office of Compliance and Consumer Assistance ("OCCA") before the ALJ invoked the cumulative evidence rule. The initial decision detailed the violations under each paragraph of the 1973 cease and desist order (as incorporated into the 1976 order) and included a 132-page appendix summarizing the 45 cases presented by OCCA witnesses. S.A. app. L. The ALJ's decision initially provided only that Aaacon's 1966 certificate should be revoked but ALJ Sarbacher subsequently corrected it to provide that all of Aaacon's operating authority, including four subsequently issued sub-numbers, should be revoked. S.A. app. L at 45; S.A. app. M.

The Commission affirmed the initial decision, rejecting all of the arguments Aaacon presses on appeal—that the removal of ALJ Benice was improper, that Aaacon lacked notice that all of its operating authority was at stake, and that the investigation should have been dismissed after three years pursuant to a provision of the Motor Carrier Act of 1980. The ICC adopted most of the ALJ's findings and conclusions and revoked all of Aaacon's operating authority. S.A. app. N. Aaacon then applied to the Commission for a stay of the revocation pending judicial review, which was denied by Commissioner Taylor. S.A. app. O.

## II. ANALYSIS

 Aaacon makes four arguments on appeal.[1] We can summarily dispose of the claim that the Commission's finding of a willful violation of the cease and desist order was not supported by substantial evidence. "Substantial" does not do justice to the extent of the evidence of Aaacon's violations of the 1976 order—"overwhelming" is perhaps a more appropriate adjective. Aaacon's remaining arguments, while somewhat more substantial, are ultimately unavailing.

### A. *Automatic Dismissal Under § 11701(c)*

Aaacon argues that the Commission erred by not dismissing the proceedings by, at the latest, three years after the effective date of the Motor Carrier Act of 1980.[2] That statute extended to motor carrier proceedings the requirement that a formal investigative proceeding brought under § 11701(a) be "dismissed automatically unless it is concluded by the Commission with administrative finality by the end of the 3d

year after the date on which it was begun." 49 U.S.C. § 11701(c) (1982).

These proceedings were initiated in 1971 pursuant to §§ 204(c) and 212(a) of the Interstate Commerce Act, and reopened in 1978 for further proceedings pursuant to § 212(a). Section 212(a), now recodified in pertinent part at § 10925(c)(1), provides that the Commission may revoke a certificate only after a carrier willfully violates an order, issued pursuant to § 11701, requiring compliance with the statute or a condition of a certificate. Section 11701(a), formerly codified in § 204(c) of the Interstate Commerce Act, gives the ICC authority to conduct formal investigative proceedings and to take appropriate action to compel carriers to comply with the Act. Because revocation must, at some point, be preceded by a formal investigation under § 11701,[3] Aaacon's argument that the Commission should have dismissed these proceedings has surface plausibility.[4]

---

1. Other arguments advanced by Aaacon but not discussed in this opinion have been considered and found to be without merit.

2. Aaacon moved for dismissal both three years after the proceedings began, as specified in § 11701(c), and three years after the effective date of the Motor Carrier Act. Aaacon argues that this court does not have to decide when the three year period began to run because the proceedings should have been dismissed either way.

3. Commissioner Taylor, in denying Aaacon's request for a stay, concluded that § 10925, read in connection with § 11701, creates a two-step process for revocation in which the first stage is a formal investigative proceeding under § 11701(a) culminating in a cease and desist order and the second stage is a proceeding to establish willful violation of that order. Because the second stage is not a "formal investigative proceeding" pursuant to § 11701(a), the three year cut-off in § 11701(c) does not apply. S.A. app. O at 4–5. Further, because the Commission can enforce a cease and desist order at any time, application of § 11701(c) to revocation proceedings would not seem to further the congressional purpose of guaranteeing an end to Commission proceedings after three years. H.R. Rep. No. 1069, 96th Cong., 2d Sess. 40, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2283, 2322.

This argument is problematic because it implies that proceedings to establish willful non-

compliance are free from the procedural requirements of § 11701(a) and, more to the point here, that such proceedings may last indefinitely. Yet in the Motor Carrier Act Congress was concerned about delays in Commission proceedings and generally specified their allowable length. Indeed, the three year period of § 11701(c) is an exception to the general rule, established in § 10322(b)(1)(A), that nonrail proceedings involving oral hearings must result in an initial decision within 270 days. Section 10322(a) specifies that proceedings under § 11701(c) are not subject to its timetable, but if the second stage of revocation proceedings does not fall within § 11701(c) it would seem that the much shorter timetable of § 10322 should apply. We need not resolve this question, however, because we conclude that § 11701(c) is not applicable to the case at hand.

4. Aaacon argues, for example, that the language of § 11701(c) applies to *all* formal investigations under § 11701(a). While this "plain meaning" approach intuitively seems plausible, it fails to be convincing upon reflection. All statutes are written in such absolute terms— even when Congress specifically wishes to address whether a provision of a statute should apply retroactively, this intention is usually incorporated into a savings clause rather than expressed separately in every provision of the statute. All this allegedly plain meaning of § 11701(c) can indicate is that the provision applies to all investigations commenced after the effective date of the Act, not that the provi-

The Commission rejected this argument, however, noting that it "consistently has held that Congress did not intend the new statute of limitations to apply to pending investigation proceedings, but only to investigations initiated after the effective date of the Act." S.A. app. N at 5; *see In re Louis J. Amato*, 367 I.C.C. 821, 825 (1983) (refusing to apply § 11701(c) to a pending proceeding because retroactive application would be inconsistent with congressional intent and the interests of justice). We agree that § 11701(c) does not apply to this pending investigation.

■ Aaacon correctly observes that, in general, agencies must apply the law in effect at the time a decision is made, even when that law has changed during the course of a proceeding. In *Bradley v. School Board of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed. 476 (1974), the Supreme Court held that the law in effect at the time a decision is made applies "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." The Court laid out several factors to consider in assessing whether "manifest injustice" would result, *id.* at 716-17, 94 S.Ct. at 2019, and stressed that its holding did not mean that decisionmakers "must always ... apply new laws to pending cases in the absence of clear legislative direction to the contrary," *id.* at 715, 94 S.Ct. at 2018.

This case presents an exception to the general rule that statutory changes should apply to pending cases ... here Congress has indicated that it would not want across-the-board retroactive application of the Mo-

tor Carrier Act of 1980.[5] While Congress did not explicitly address the question of what law should apply in pending proceedings, we need only a "fair indication" of congressional intent. *Litton Systems, Inc. v. AT & T*, 746 F.2d 168, 174 (2d Cir.1984). Here we have findings accompanying the Act which specify that "legislative and resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the scope of the reforms enacted." Motor Carrier Act of 1980, Pub.L. No. 96-296, § 3(a), 94 Stat. 793 (1980). The Fifth Circuit relied on this congressional finding to support its conclusion that Congress did not intend the Motor Carrier Act to apply retroactively to pending proceedings. *Watkins Motor Lines, Inc. v. ICC*, 641 F.2d 1183, 1186-87 (5th Cir.1981);[6] *see also Curtis, Inc. v. ICC*, 669 F.2d 648, 651 n. 3 (10th Cir.1982) (following *Watkins*). The *Watkins* court found that it would be disruptive to require the parties "to be thrust back to the beginning" of the proceedings and noted that applying the prior law did not violate the intent or spirit of the 1980 statute. 641 F.2d at 1187-88.

We conclude that retroactive application of § 11701(c) to this proceeding would similarly be disruptive without furthering the purposes of the Act. A dismissal order would not affect the ICC's authority to enforce the 1976 cease and desist order. Given the evidence against Aaacon adduced in this proceeding, it seems a foregone conclusion that if this investigation were dismissed at this late date the Commission would start up another investigation and

---

sion applies to all pending cases. *Cf. Burlington Northern Inc. v. United States*, 679 F.2d 915, 917 (D.C.Cir.1982) (refusing to retroactively apply a provision of the Staggers Act of 1980 which facially applies to all challenges to transportation rates).

5. Thus, this case is distinguishable from *Aero Mayflower Transit Co. v. ICC*, 686 F.2d 1, 7 n. 10 (D.C.Cir.1982), in which this court held that a provision of the Motor Carrier Act of 1980 prohibiting the ICC from issuing certificates based on general findings developed in rulemaking proceedings applied to pending applications.

The court specifically found that "Congress intended to prohibit 'the issuance of a certificate' based on a general finding developed in a rulemaking proceeding if the certificate was issued after the July 1, 1980 effective date of the Motor Carrier Act." *Id.* at 7.

6. The *Watkins* holding applied to proceedings in which the ICC had rendered a decision as of July 1, 1980, the effective date of the Act. 641 F.2d at 1187. We extend *Watkins'* reasoning to these proceedings, which were "well underway" as of that date. *See infra* at 1162.

spend up to another three years replicating its efforts. Rather than implementing the congressional intent of giving Aaacon a "guarantee of an end to formal Commission investigations" within a three year period, H.R. Rep. No. 1069, 96th Cong., 2d Sess. 40, *reprinted in* 1980 U.S. Code Cong. & Ad. News 2283, 2322, such a scenario would, ironically, subject Aaacon to additional years of investigation.

This court has also relied upon factors such as promotion of administrative and judicial economy in assessing whether considerations of "manifest injustice" preclude applying a new statute to a pending proceeding. In *Burlington Northern Inc. v. United States*, 679 F.2d 915 (D.C.Cir.1982), we declined to apply the Staggers Rail Act of 1980 to a pending proceeding on these grounds. Much of the court's reasoning there is applicable to this case:

> [T]he legal and factual issues had already been extensively litigated before the Commission, and the issues involved related to events and rates that antedated the Staggers Act by several years. Under the circumstances, it would work a substantial and manifest injustice on [the company challenging a rate increase] to force it to relitigate these issues before a court, and it would be a poor use of judicial resources as well as those of the parties to duplicate the Commission's competent efforts on these issues.

*Id.* at 917. Although our concern in that case focussed on burdening a private litigant, an equally apposite consideration arises here if OCCA, which represents the interests of consumers before the Commission, is required to expend its limited resources in relitigating the charges against Aaacon.

■ The import of both the congressional directive to avoid disruption and the manifest injustice of wasting private, administrative, and judicial resources varies depending on how long the pending proceedings have been ongoing. This court's refusal to retroactively apply the provisions of the 1980 Staggers Act involved ICC proceedings which were well underway on the effective date of the Act. *Burlington Northern,* 679 F.2d at 917; *Burlington Northern Railroad v. ICC,* 679 F.2d 934, 939 (D.C.Cir.1982). The instant proceedings were "well underway" when the Motor Carrier Act was enacted on July 1, 1980. The reopened proceedings began in 1978 and by July of 1980, when the statute went into effect, had already produced an initial decision and a Commission reversal and remand. We therefore hold that § 11701(c) did not apply to the pending investigation of Aaacon.

### B. *Change of Administrative Law Judges*

Aaacon contends that the Commission erred by "replacing" ALJ Benice with ALJ Sarbacher without complying with the Administrative Procedure Act ("APA"), which requires an agency to assess the bias of an ALJ "[o]n the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification." 5 U.S.C. § 556(b) (1982). Aaacon argues that § 556(b) provides the only procedure for removal of an ALJ without violating the APA's requirement that ALJs "shall be assigned to cases in rotation so far as practicable." 5 U.S.C. § 3105 (1982). This argument is based on a misunderstanding of both provisions.

■ While § 556(b) clearly specifies one way in which ALJs can be removed from a proceeding, it is not the exclusive avenue. That section is clearly inapposite to this situation, which involves no charge of bias or other disqualification against ALJ Benice by a party. The question to be addressed here is whether the ICC properly ordered the proceedings on remand to be assigned to another ALJ for reasons other than bias.

■ The Commission cited, as one reason for its decision, ALJ Benice's inadequate handling of the sixteen days of proceedings held prior to issuance of his initial

decision.[7] S.A. app. I at 6. The ICC is authorized to delegate matters to ALJs and to change or rescind such delegations at any time. 49 U.S.C. § 10305(a) (1982). This authority is, of course, cabined by the APA, which requires agencies to assign ALJs in rotation to the extent "practicable." 5 U.S.C. § 3105. The Supreme Court has held, however, that the word "practicable" is broad enough to encompass factors such as the complexity of the case and the experience and ability of the ALJ. *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 139–40, 73 S.Ct. 570, 576–77, 97 L.Ed.2d 872 (1953). The ICC's decision to change ALJs on remand because of ALJ Benice's proven inability to cut through Aaacon's dilatory tactics and move the proceedings along plainly falls within the "modicum of discretion" which *Ramspeck* accords the ICC in its assignment of ALJs. *See Tractor Training Service v. FTC*, 227 F.2d 420, 423 (9th Cir.1955), *cert. denied* 350 U.S. 1005, 76 S.Ct. 649, 100 L.Ed. 867 (1956).

■ Thus, although Aaacon's arguments indicate that the Commission did not have to reassign the case on remand, they do not establish that the ICC abused its discretion under *Ramspeck* in choosing to do so. The Commission cannot, of course, change ALJs if the intent or effect of its action is to interfere with the independence of the ALJ or otherwise to deprive a party of a fair hearing. *Tractor Training*, 227 F.2d at 423–24; *Chicago, Burlington & Quincy Railroad*, 318 I.C.C. 180, 183 (1962). Aaacon has not, however, established that this was the ICC's intention or that the switch was in any way prejudicial to Aaacon. ALJ Benice did not preside at the taking of any evidence, so the change did not require the new ALJ to make credibility determinations as to witnesses he had not heard. And Aaacon's argument that rulings by the new ALJ demonstrate prejudice is patently erroneous: these rulings do not evidence an abuse of discretion, although they may

differ from those the original ALJ would have made. Indeed, Aaacon can never even know for sure how the first ALJ would have ruled on those issues. We therefore conclude that there is no evidence that the change of ALJs in the remanded proceedings failed to conform with the requirements of the APA or otherwise deprived Aaacon of a fair hearing.

### C. *Revocation of Aaacon's Operating Authority*

Finally, Aaacon charges that the Commission erred by allowing the ALJ to change his order to provide that all of Aaacon's authority, rather than just its 1966 Sub-No. 1 certificate, should be revoked. The Commission rejected this argument, concluding that Aaacon had adequate notice that all of its operating authority was at issue in the revocation proceeding. We agree.

■ The Commission order instituting the revocation proceeding noted only that Aaacon's 1966 certificate could be revoked. S.A. app. G. At that time, however, that certificate constituted all of Aaacon's operating authority. Even if the notice was flawed due to its failure to note that subnumber certificates issued under the 1966 certificate in the future would be subject to revocation, any inadequacy was remedied by the notice afforded to Aaacon during the conduct of the proceedings. *See Common Carrier Conference—Irregular Route v. United States*, 534 F.2d 981, 983 (D.C.Cir.) (flawed notice overcome if actual conduct of the rulemaking provides notice), *cert. denied*, 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976); *National Steel & Shipbuilding Co. v. Director, Office of Workers' Compensation Programs*, 616 F.2d 420, 421 (9th Cir.1980) (same is true in adjudicatory proceedings).

The 1973 proposed cease and desist order, incorporated into the 1976 order, pro-

---

**7.** The other reason the ICC gave for the change of ALJs on remand was ALJ Benice's participation in the settlement proceedings. S.A. app. I at 6. Because we conclude that the ICC could make the reassignment to rectify ALJ Benice's indecisive handling of the initial proceedings, we need not rule on the appropriateness of this second rationale.

vided Aaacon with notice that all of its sub-number certificates were at stake in the revocation proceedings. The eleventh paragraph of the order provided that "upon the willful failure of respondent to comply with any of the provisions of this order, the certificate issued to the respondent, AAAcon Auto Transport, Inc., in No. MC–125808 *and sub-numbers thereunder,* may be suspended or revoked in whole or in part." S.A. app. B at 15 (emphasis added). Aaacon claims that this portion of the proposed order was not, for some reason, incorporated by implication into the 1976 order. Reply Br. at 16. This court has already held, however, that Aaacon is barred by *res judicata* from relitigating the scope of the 1976 order and whether it incorporated the 1973 proposed order, because those issues were or could have been brought before the Second Circuit. S.A. app. K at 5–6; *see supra* at 3–4. That decision constitutes the law of this case and so we proceed on the assumption that all of the 1973 proposed order, including paragraph 11, was incorporated into the 1976 order and is binding on Aaacon.

■ Aaacon also contends that its sub-number certificates could not be revoked because the ICC failed to "flag" the issue of Aaacon's fitness when it granted the company additional operating authority during the time the revocation proceedings were going on. This argument is, however, based on a misunderstanding of the Commission's "flagging" regulations. The flagging regulations require a hearing when the Commission decides *not* to issue

any new authority to a carrier pending adjudication of that carrier's fitness in an ongoing application proceeding. The purpose of such a hearing is to determine whether the fitness issue in the selected application proceeding has a sufficient nexus to the other requested authority to warrant withholding the requested new authority until the fitness issue is resolved. 49 C.F.R. §§ 1067.1, 1067.7 (1985).

Here, however, the Commission granted the requested new authority rather than withholding it pending the outcome of the revocation proceedings, so no "nexus" hearing was required under the flagging regulations. During the course of the revocation proceedings Aaacon received four additional sub-number certificates. In Sub-No. 7 Aaacon sought authority to transport used automobiles in wrecker service.[8] S.A. App. N at 13. Aaacon also requested two modifications of its certificate: M1F to remove the restriction precluding movements to automobile dealers and M2F to delete the word "used" and allow movement of all passenger automobiles. J.A. at 10–15, 20–25. Finally, Aaacon sought a restriction removal in Sub-No. 8x allowing it to move all transportation equipment, rather than just automobiles. *Id.* at 3–9. All of these sub-numbers were granted rather than withheld, so the flagging regulations never came into play.

Neither did the Commission's actions in the sub-number proceedings in any way indicate that those additional authorities would survive the revocation proceeding.[9]

---

**8.** In that proceeding Aaacon and the Bureau of Investigations and Enforcement (predecessor of OCCA) stipulated that the Bureau would reserve for the revocation proceeding all evidence on Aaacon's fitness. S.A. app. N at 13.

**9.** Aaacon's argument that the revocation proceeding encompassed only the 1966 certificate assumes that the sub-number certificates pertained to operations independent of those authorized in the original certificate. In fact, however, all of the sub-number certificates grow out of and depend upon the original certificate and all the grants assumed that the underlying certificate was valid.

Aaacon's Sub-No. 8X certificate, for example, resulted from a restriction removal proceeding

and provided that it "superseded" the original certificate. J.A. at 6. The Commission has explained that an "X" certificate, which supersedes rather than cancels the underlying authority, is so intimately linked to the original certificate that the two must be treated as a single operating right. Stewart Trucking Co., 127 M.C.C. 793, 796–97 (1982). In addition, restriction removal proceedings are supposed to proceed swiftly, so this court has held that the issue of an applicant's fitness to hold the underlying certificate may be considered in a separate proceeding rather than in the restriction removal proceeding. *B.J. McAdams, Inc. v. ICC,* 698 F.2d 498, 503 (D.C.Cir.1983). That is exactly what the Commission did here. J.A. at 8.

In each proceeding, the Commission was careful to establish that the fitness issue was simply being reserved for the revocation proceeding. *See* Commission Decision, S.A. app. N at 13. Thus, rather than restricting the scope of the revocation proceeding as Aaacon claims, these sub-number proceedings actually provided Aaacon with additional notice that the revocation proceeding encompassed the issue of fitness to hold all of the sub-number certificates.

### III. CONCLUSION

Aaacon's protracted journey through the Commission and the courts has finally come to a dead end. We find no procedural error in the Commission's decision to revoke all of Aaacon's operating authority for willfully failing to comply with the 1976 cease and desist order. The decision is supported by more than substantial evidence in the record. Aaacon's petition for review is accordingly

*Denied.*

---

The M1F and M2F certificates simply modified the original certificate. The M2F proceeding was decided first and deleted the word "used" from the certificate; it certainly makes no sense to consider such authority separately from the 1966 certificate. The M1F proceeding modified the original certificate to delete the restriction against deliveries to automobile dealers. The M1F certificate cancelled the original certificate and replaced it with one encompassing the original authority and the changes made in both the M1F and M2F proceedings. J.A. at 19. Again, however, the proceeding assumed that Aaacon was fit to hold the original authority as incorporated into the M1F sub-number certificate.

If Aaacon is to be believed, the company, OCCA and the ICC spent years litigating the question of whether to revoke a superseded and cancelled certificate. After examining the proceedings on the sub-number certificates, however, we conclude that all involved understood that all of Aaacon's operating authority was tied to the 1966 certificate and assumed that if that certificate was revoked the subsequently-issued sub-numbers would also be revoked.