**Ralph J. ZOLA, North American Transport Co., Inc., and Auto Caravan Corp., Petitioners,**

v.

**INTERSTATE COMMERCE COMMIS-SION, and United States of America, Respondents.**

No. 89–3499.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 1989.

Decided Nov. 16, 1989.

Rehearing and Rehearing In Banc Denied Dec. 18, 1989.

Larsh B. Mewhinney, (argued), Moore, Berson, Lifflander, Eisenberg & Mewhinney, New York City, for petitioners.

Michael L. Martin (argued), Office of the Gen. Counsel, I.C.C., Washington, D.C., for respondents.

Before: HIGGINBOTHAM, STAPLETON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

The current proceeding is the most recent skirmish in an adversarial relationship between Ralph J. Zola and the Interstate Commerce Commission ("ICC" or "Commission") that has continued for almost two decades. In the order now under review, the ICC revoked the operating certificate of the North American Transport Co., Inc. ("Natco"), a carrier owned and operated by Zola. The Commission also prohibited Zola from engaging in any transportation activities within its jurisdiction. We will vacate the Commission's order only insofar as it bars Zola from conducting transportation activities that are wholly unrelated to those at issue in the present and prior I.C.C. proceedings. In all other respects, we will deny the petition for review.

## I. Background

The present case is the culmination of almost two decades of I.C.C. proceedings involving Ralph J. Zola and his businesses. These proceedings began in 1971, when the ICC commenced an investigation of AAA-Con Auto Transport, Inc. ("AAACon"), an interstate carrier owned and operated by Zola. AAACon's automobile "driveaway" service hired out drivers to transport customers' automobiles, pursuant to an ICC certificate permitting it to operate as a motor common carrier in the transportation of used passenger automobiles in the continental United States. In November 1973, an ICC administrative law judge ("ALJ") issued an initial decision finding the AAA-Con was not a fit carrier because of, *inter alia*, its handling of customers' damage and loss claims, improper provisions in its bills of lading, misrepresentations concerning its insurance coverage and bonding of drivers, and performance of acts not authorized by its ICC certificate (e.g., transporting repossessed, stolen, or abandoned automobiles, and performing driveaway services for automobile dealers). The ALJ ordered AAACon to cease and desist from these practices. *AAACon Auto Transport, Inc.*, I.C.C. No. MC–C–7287 (November 30, 1973), reprinted in Respondents' Addendum ("Add.") B at 13–16. The ALJ also noted Zola's close involvement with AAACon, stating that Zola served as vice president, director, treasurer, principal shareholder, and counsel for the corporation. Add. B at 10. Zola, who is an attorney, practiced with his brother in a law firm which maintained offices in common with AAACon and which handled the company's legal matters, including claim settlement. Add. B at 6.

The ICC affirmed the ALJ's cease and desist order and the United States Court of Appeals for the Second Circuit dismissed AAACon's petition for review, stating that the findings of "unjust and unreasonable practices" were supported by substantial evidence and that the application and scope of sanctions were proper. *AAACon Auto Transport, Inc.*, 124 M.C.C. 493 (1976), *aff'd sub nom. AAACon Auto Transport, Inc. v. I.C.C.*, 553 F.2d 93 (2d Cir.1977) (Add. C).

After receiving numerous complaints from the public, the ICC reopened its investigation of AAACon. In a February 1983 decision and order ("AAACon revocation

order"), an ALJ found that AAACon had repeatedly and willfully violated the terms of the cease and desist order and, as a result, that AAACon's certificate should be revoked.[1] Zola's role in the corporation was again described by the ALJ:

> When one considers the record as a whole (i.e. the oral testimony of the complaining witnesses and those witnesses sponsored by AAACon, as well as the exhibits sponsored by the parties), it is apparent that the sustaining force behind [AAACon] is that of its president; and it is his views which dominate and permeate the entire company from the very top to its lowest levels....
>
> .    .    .    .    .
>
> The evidence reflects that when [AAACon's] Review Committee (composed of Messrs. Zola, Blackman, and Silvestri) meet to discuss and decide the larger claims, it is Mr. Zola's view which prevails even when such view is not in accord with those of Messrs. Blackman and Silvestri. It is apparent to this Judge that what is lacking is not guidance from the Commission, but a commitment from [Zola] to a firm adherence to the Commission's cease and desist order and making certain that AAACon's officials, employees, agents, and drivers understand that violations of that order will not be tolerated.

Add. K at 36–37.

On appeal, the AAACon revocation order was affirmed by the ICC and the United States Court of Appeals for the District of Columbia Circuit. In its August 1984 decision, the ICC noted:

> The record reveals that even the entry of the cease and desist order in 1976 did not dissuade AAACon from continuing to engage in activities of the type proscribed. Indeed, it appears that respondent simply masked certain prohibited activities and continued them. Consumer fraud, abuse, and harassment continued.... Respondent, far from demonstrating compliance, has shown disdain and contumacy.

*AAACon Auto Transport, Inc., Investigation and Revocation of Certificate,* ICC No. MC–C–7287 (July 30, 1984), Add. F at 21–22. In affirming the ICC, the D.C. Circuit remarked that " '[s]ubstantial' does not do justice to the extent of the evidence of Aaacon's violations of the 1976 order—'overwhelming' is perhaps a more appropriate adjective." *AAACon Auto Transport, Inc. v. Interstate Commerce Commission,* 792 F.2d 1156, 1160 (D.C.Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 834 (1987).

Simultaneous with his legal challenge to the AAACon revocation order, Zola was actively pursuing extra-judicial means of escaping the effect of the Commission's order. Following the ALJ's initial decision, two of Zola's relatives unsuccessfully sought ICC interstate transportation licenses. On June 6, 1983, Irving Zola, Ralph Zola's father, applied for an ICC certificate for a non-operating company called "AA Babcock." The ICC originally granted the application, but cancelled the certificate in

---

**1.** Both Natco and Zola make much of the ALJ's prescient observation that Zola might attempt to circumvent the Commission's authority by acquiring a "new corporate shell" to carry on AAACon's business. They assert that the ALJ properly noted that the revocation order does not "run[ ] against" Zola, and thus that the revocation of AAACon's authority did not "preclude the principals behind [AAACon] from forming a new corporation and obtaining nationwide driveaway authority." Add. K at 43. In essence, the petitioners contend that by purchasing Natco, and operating a driveaway business under the auspices of Auto Caravan, Zola was simply following the ALJ's suggestion on how he could circumvent the AAACon revocation order.

However, the ALJ in the AAACon proceeding did not have before him the facts of this case and, for the reasons discussed *infra,* we do not believe that the ALJ's dicta correctly states the scope of the Commission's power to enforce compliance with its fully adjudicated orders. *Cf.* Add. F at 22 (ICC stated in AAACon revocation decision that its independent determination that "AAACon's egregious violations of the cease and desist order warrant revocation" renders moot issues regarding ALJ's dicta). In any event, the petitioners mischaracterize the context and intent of the ALJ's discussion in this regard, which was essentially a complaint about some of the limitations on the Commission's ability to deal effectively with individuals, such as Zola, who willfully and repeatedly disregard the ICC's cease and desist orders.

a January 1986 Decision and Order after finding that the AA Babcock was a "paper corporation" set up to allow the Zolas to continue operating AAACon's auto driveaway service.[2] *AA Babcock Transport, Inc. Common Carrier Application,* I.C.C. No. MC–168499 (January 24, 1986) (Add. G.), *aff'd sub nom., AA Babcock Transport, Inc. v. Interstate Commerce Commission,* 821 F.2d 821 (D.C.Cir.1987). On October 20, 1983, a company called "AA Aaron", owned by Marion Zola, Ralph Zola's sister (who was a 20% AAACon shareholder), applied for a license as a broker for the interstate transportation of general commodities. However, after the ICC issued a decision scheduling a hearing on the applicant's fitness, Add. J,[3] this application was withdrawn.[4]

On October 8, 1984, the same date that the revocation of AAACon became effective,[5] Zola—proceeding under the corporate name Watermill Corporation—closed on a

contract to purchase the stock of Natco. At the time, Natco was an operationally defunct entity whose only significant asset was an ICC certificate of public convenience and necessity permitting it to transport general commodities. Zola paid the $12,000 purchase price with a check from his personal account. Respondents' Appendix ("Resp. App.") at 2–3. In October 1984, Zola's law firm filed articles of incorporation for Auto Caravan Corp. ("Auto Caravan"), listing Ralph Zola as sole shareholder, officer, and director. *See id.* at 7–8.

Zola then engaged in what may appropriately be described as a "shell game" to enable Natco and Auto Caravan to resume AAACon's operations without interruption. His strategy was mapped out at a September 1984 convention of AAACon agents and office managers.[6] At the meeting, Zola stated that Auto Caravan would issue

---

**2.** In its decision, the ICC stated that the evidence of deception, *i.e.,* a sham corporation, with no offices, no principals, and a bogus legal representative, ... adequately supports our finding that Irving Zola willfully misled this Commission to believe that a new trucking company, genuinely interested in performing a nationwide general commodities service, was being licensed. It is plain that Irving Zola who, at 70 years of age, and who had spent about a decade in retirement in Florida (and whose wife, the record shows, never even heard of AA Babcock, and whose Fort Worth attorney never even met nor spoke with him) had absolutely no genuine intention of moving himself and his wife to Fort Worth, TX to commence a nationwide interstate general commodities trucking operation. It was simply a scheme devised to cause this Commission to issue authority to Irving Zola—authority that would serve as insurance for the Zola family in the event that this Commission revoked, as we in fact did, the AAACon authority. Add. G at 7.

**3.** The decision scheduling this hearing notified the applicant that the ICC considered that there was "reason to believe that the principals of AAACON may be the real parties in interest in this application; and that these individuals may be seeking a method of conducting essentially the same operations as those of AAACON, under the guise of acting as a broker for the transportation of property." Add. J. at 2.

**4.** Natco argues strenuously that the proceedings involving applications by Zola's relatives are irrelevant to the present action because Zola

was not a party to those proceedings, and "[n]o evidence was adduced demonstrating or even suggesting that Mr. Zola engaged in any wrongdoing in connection with those applications." Natco Reply Brief at 7.

Although the applications by Irving and Marion Zola are by no means critical to our decision, we utterly disagree with Natco's characterization of these proceedings. There was more than substantial evidence in *AA Babcock* to support the ICC's finding that Irving Zola's application for a certificate was a blatant attempt by the Zola family to circumvent the AAACon revocation order.

It is true that Marion Zola's application in *AA Aaron* was voluntarily withdrawn before the hearing. However, given the more than ample evidence of Ralph Zola's attempts to circumvent the AAACon order, we need not be blind to the possibility, if not the likelihood, that this application was also part of a scheme to circumvent the AAACon revocation order.

**5.** The former owner of Natco, Pinnie Oliver, testified at the administrative hearing that the closing date was selected by Zola. Appendix ("App.") at 17.

**6.** Zola's remarks were tape recorded by a number of convention participants. Transcripts of the recordings were admitted into the record at the administrative hearing. In its decision, the Commission noted that it is "irrefutable that Mr. Zola made the statements attributed to him." App. at 39 n. 5.

new agency agreements, explaining: "the intent of the agreements, I can tell you right now, will be to put you in the same position you were under AAACon's operation, with zero changes." Resp. App. at 64. Zola explained that the "tariffs, charges, and the contract terms, with a very, very few technical exceptions ... will be exactly the same as now used by AAACon.... You will hardly even notice the difference in the forms except the name itself." *Id.* at 57. He also stated that the phone numbers used by AAACon would remain the same. *Id.* at 61.

Zola reassured the AAACon agents and employees:

> So again, you are going to end up on October 8th where you are on October 7th, hopefully, if this thing comes off the way it is supposed to....
>
> . . . . .
>
> When I say if this goes off as planned, I mean the printing gets distributed by United Parcel to every office and the contracts don't have the word "AAA-CON" where it doesn't belong. The rights are already—how can I put this legally—arranged for in a way that is legally binding. So on October 8th, Auto Caravan shall, like Phoenix, arise from the ashes, and there is no way to stop it. Okay?

*Id.* at 65.

Zola instructed his audience on how to describe to the public the relationship between the old AAACon and the new Auto Caravan:

> Now, if you are called up and asked about AAACon and they probe, well, what is the relationship of Auto Caravan to AAACon, undoubtedly that is only one of two people, it's the ICC or it's a competitor. The public, God bless them, doesn't know from nothing. They want their car shipped. They know the name in the phone book....
>
> . . . . .
>
> If someone finally says, "Is this AAACon Auto Transport" and pushes you that way, you say, "I used to be an agent for them, now I'm an agent for Auto Cara-

van." Stick your chin right out because all you are doing is getting it from someone who is pulling your strings.

*Id.* at 58–60.

Zola offered further public relations suggestions in the following colloquy at the convention.

> FROM THE FLOOR: You are going to get a question like, when you answer the phone and say, Auto Caravan, they are going to say, well, how long have you been in business. We never heard of you before.
>
> MR. ZOLA: You have been in business for several years under another name. Now, I don't mean AAACON by that. Auto Caravan used to be North American Transport Company, [a] business [for] over two and a half years. Or, I have been in this business ten years, how long have you been in the business?
>
> FROM THE FLOOR: About seven years.
>
> MR. ZOLA: I have been in this business over seven years, you tell them. You never heard of us? We are the company that owns offices in more major cities than any other company in the United States.
>
> What you do is, he doesn't know what he doesn't know.
>
> FROM THE FLOOR: I am not talking about the individual but you are going to get your business accounts.
>
> MR. ZOLA: Right.
>
> FROM THE FLOOR: And they are going to say, well, now Auto Caravan is a new name to me.
>
> MR. ZOLA: Right.
>
> FROM THE FLOOR: I don't believe I have ever heard of them before.
>
> MR. ZOLA: Right. The answer is, if they know you, you can say, you heard of AAACON. We used to be with AAA-CON, not we used to be AAACON, but we used to be with AAACON. We found a name that is easier to spell. We bought greater authority, more rights and then you go into your pitch.
>
> FROM THE FLOOR: (Inaudible.) Could we say that we felt like we had to expand into a lot of different areas?

MR. ZOLA: We are expanding into a lot of different areas.

FROM THE FLOOR: So on that basis, we decided a name that had more universal appeal?

MR. ZOLA: I will let you throw the bull the way you see fit.

[Laughter.]

MR. ZOLA: The only thing I don't want you to do is tell them this is the same corporate entity. You can say to them simply, just work it into the conversation quickly, we thought we ought to get more rights because we are expanding, we obtained a new corporate entity, we have a name, you see how it is working, we have a name that is easy to understand.

*Id.* at 77–78.

Zola reiterated his advice to AAACon employees and agents in an October 2, 1984 memorandum, in which he stated that "as of October 8, 1984, AAACon will stop transporting vehicles and Auto Caravan, a division of North American Transport Co., Inc., will begin transporting vehicles in interstate commerce." He stated that agents would soon be receiving agency agreements and tariffs that "will closely match AAACon's." He advised the agents to destroy unused AAACon material; change the yellow pages, postal, and building directory listings to "Auto Caravan"; and advise customers that all vehicles in transit on or after October 8 were being transported by Auto Caravan—a carrier with "the same insurance and contract terms as AAACon." *Id.* at 5.

In the memorandum, Zola repeated his instructions on the proper method of describing the Auto Caravan to outsiders.

On and after October 8th, no doubt your phones will be ringing from three sources: (1) legitimate customers; (2) your competitors; and (3) the I.C.C. As to your legitimate customers, just answer the phone "Auto Transport", and send out the literature of Auto Caravan. As to anyone who asks you "Is this AAACon?", simply state that you used to work for AAACon, this is now Auto Caravan—a new corporate entity. If they press you on it a great deal, it is probably a competitor or the ICC, and you can make it clear that it is a different company and for any technical questions, they can call the home office and ask for Harvey or Ralph and we'll be happy to explain it to them in very great detail. To your customers, stress that we have the same insurance and we offer the same fine service that you offered with AAACon.

*Never* say merely that "AAACon has changed its name."

*Id.* at 6.

Several AAACon agents who remained during the transition period later testified that Natco/Auto Caravan's procedures and operations were virtually identical to AAACon's, except for the phone answering procedure. *See, e.g.,* Resp. App. at 82–88. Furthermore, to prevent the loss of sales agents, and particularly to prevent AAACon's telephone numbers from being taken by defecting agents, Natco and AAACon, through Zola's law firm, filed lawsuits against a number of agents who refused to work for Natco after the transition. Appendix ("App.") at 43–44.[7]

When the ICC learned of the emergence of Natco/Auto Caravan, it commenced an investigatory proceeding. In its August 1986 decision opening this proceeding, the ICC ordered Zola and Natco/Auto Caravan to show cause why Natco's operating authority should not be revoked, and why Zola should not be ordered "permanently to cease and desist from engaging, directly or indirectly, in any for-hire transportation ac-

---

**7.** The lawsuits against former AAACon agents are relevant to the issue of whether Zola and the other principals behind AAACon intended for Natco to carry on AAACon's operations. We agree with the characterization of these lawsuits in the Commission's decision.

The ALJ properly found that the ultimate merits of those lawsuits are not a matter for consideration in this proceeding. Nevertheless, the testimony of the former agents and employees is instructive in the light it sheds on Mr. Zola's course of action. Whatever other purpose the lawsuits might serve, they did tend to perpetuate the AAACon operations.

App. at 46.

tivities within [the] Commission's jurisdiction." *Id.* at 9.[8] Extensive hearings before an ALJ, involving over 50 witnesses, resulted in a December 1987 initial decision which found that Zola "intentionally and willfully evaded" the AAACon revocation order by continuing AAACon's business through Natco/Auto Caravan. The ALJ concluded:

> The only *effective* remedial device is the extinguishment of the Zola/Natco/[Auto Caravan] subterfuge through an order revoking Natco's operating authority (No. MC–162160) and directing Zola to cease and desist from engaging, directly or indirectly, in any for-hire transportation activities within the Commission's jurisdiction.... The Commission, upon a petition or application by Zola, may remove this prohibition ... upon a finding that it is no longer necessary. Such action shall not be unreasonably withheld.

*Id.* at 31.

On June 21, 1989, the ICC affirmed the ALJ's order. The Commission stated that the 1984 AAACon revocation order was "not merely a formalistic action. It was intended as a severe, final sanction warranted by the egregious violations of the agency's order directing AAACon to cease and desist from committing specified deceptive, abusive, and unlawful practices. The clear purpose and import of the revocation order was to permanently terminate the AAACon operations." App. at 44. The ICC found that the evidence was "crystal clear [that] the AAACon operations did not miss a beat when the revocation order became effective" but merely continued under a different name. *Id.* at 44–45. The ICC considered that the evidence of Zola's role in the scheme to circumvent the AAACon order was "overwhelming."

> Mr. Zola advised his agents and employees to assure skeptics that "we intend to be here at the same stand, day in, day out, week in, week out, for years, and that nothing has changed." His intention to evade the Commission's order is evident in his boast to them that the

operations would continue despite the Commission's "annoying" proceedings. *Id.* at 45.

The Commission stated that the revocation of Natco's operating authority and the debarment sanction against Zola were necessary to ensure the integrity of its orders and the administrative process. App. at 48.

> Respondents contend that Mr. Zola is being foreclosed from engaging in the transportation industry without having been a party to any proceeding in which he was charged with wrongdoing. This argument overlooks the obvious. It is here in *this proceeding* that Mr. Zola has been charged with devising and putting into effect a scheme for evading an order of the Commission. Mr. Zola has also been charged with a direct violation of the revocation decision which, by obvious implication, ordered AAACon to cease operations. It is well-settled that a command to a corporation is, in effect, a command to those who are officially responsible for the conduct of its affairs.... In any event, all the evidence points to the fact that Mr. Zola was the *alter ego* of AAACon, and he is now the *alter ego* of NATCO/Auto Caravan.

*Id.* at 49–50 (footnote omitted). The ICC concluded that the revocation of Natco's certificate was warranted because the Natco enterprise was a subterfuge to escape the AAACon revocation order. The Commission also stated that in light of Zola's "central role and responsibility" for AAACon's consumer fraud and abuse, and his willful scheme to evade and circumvent the revocation order, it was "necessary and appropriate to now require Mr. Zola to cease and desist from engaging in *any* for-hire transportation activities within our jurisdiction." *Id.* at 51. (emphasis in original).

In its final order, the ICC revoked Natco's operating authority and prohibited Auto Caravan and Caravan Co. from conducting interstate for-hire transportation.

---

**8.** Zola's suit to enjoin the Natco revocation proceedings was dismissed on grounds of ripeness and failure to demonstrate irreparable injury.

*Zola v. I.C.C.,* No. 86–5127 (D.N.J. May 1, 1987) (Add. I), *aff'd* 838 F.2d 1208 (3d Cir.1988).

The ICC also ordered Zola to "cease and desist, and thereafter refrain and abstain from, directly or indirectly engaging in any transportation activities within the Commission's jurisdiction until further order of the Commission." App. at 52.[9] In a footnote to the above provision, the Commission stated: "Upon petition from Ralph J. Zola and for good cause shown, the Commission may remove this prohibition in whole or in part upon a finding that it is no longer necessary." *Id.* at n. 15.

Zola and Natco/Auto Caravan[10] now petition for review of the ICC's order.

## II.  Discussion

As the Commission noted in its June 1989 opinion, App. at 47–48, this case is exceptional in a number of respects. AAACon, under Zola's management and control, was found to have committed an exceptional amount of consumer fraud and abuse. The ICC expended exceptional efforts to address and remedy AAACon's misconduct, including in-depth investigations of consumer complaints, extensive administrative proceedings, and a specific cease and desist order proscribing AAACon's unlawful conduct. AAACon, still under Zola's direct control, then repeatedly and willfully violated the terms of that order, prompting the ICC to take the exceptional step—again after extensive administrative proceedings—of revoking AAACon's operating authority. Zola again went to exceptional lengths to flout the Commission's order, this time by continuing AAACon's operations under the auspices of his newly acquired carrier. Finally, in its decision revoking the new corporation's operating authority, the Commission took the apparently unprecedented action of barring an individual, for an indefinite period, from engaging in any "transportation activities" within its jurisdiction.

Because the validity of the two components of the Commission's order, the revocation of Natco's operating authority and the debarment of Zola, involve different considerations, we shall discuss the two measures separately. First, however, we shall review the statutory basis for the Commission's enforcement and sanctioning powers.

### A.  ICC Enforcement Authority

Administrative agencies such as the ICC have limited powers to impose sanctions and institute remedies for statutory violations. Under the Administrative Procedure Act, an agency is prohibited from imposing a sanction "except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b); *see also Arrow–Hart & Hegeman Electric Co. v. Federal Trade Commission*, 291 U.S. 587, 598, 54 S.Ct. 532, 537, 78 L.Ed. 1007 (1934) ("The Commission is an administrative body possessing only such powers which are granted by statute."). However, in recognition of their particular expertise and complex responsibilities, regulatory agencies are afforded some discretion in determining which sanctions or remedies would best effectuate statutory objectives. The courts may intervene only if the agency's sanction or remedy "is unwarranted in law or is without justification in fact. . . ." *American Power & Light v. Securities and Exchange Commission*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946); *see also Atlantic Refining Company v. Federal Trade Commission*, 381 U.S. 357, 367–68, 85 S.Ct. 1498, 1505–06, 14 L.Ed.2d 443 (1965); 4 Stein, Mitchell, Mezines, *Administrative Law* § 42.01 (1989).

The Interstate Commerce Act ("Act"), 49 U.S.C. § 10101, *et seq.*, vests the Interstate Commerce Commission with the authority to supervise and regulate interstate carriers. The Supreme Court has interpreted this grant of power in a common sense fashion to give effect to the Act's purposes. In *Interstate Commerce Commission v. American Trucking Associations, Inc.*, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), the Court held that the ICC's statutory rate-setting authority gave

---

**9.** *See infra* note 13.

**10.** Auto Caravan functions as the operating division of Natco. Therefore, references to Natco apply also to Auto Caravan.

it the power to reject effective tariffs that are in substantial violation of rate bureau agreements, even though this remedial power was not expressly delegated to the Commission. The Court explained:

> The Commission's authority under the Interstate Commerce Act is not bounded by the powers expressly enumerated in the Act. . . . [T]he Commission also has discretion to take actions that are " 'legitimate, reasonable, and direct[ly] adjunct to the Commission's explicit statutory power.' " We have recognized that the Commission may elaborate upon its express statutory remedies when necessary to achieve specific statutory goals. . . .

467 U.S. at 365, 104 S.Ct. at 2464 (citations omitted). The Court noted that the doctrine of ICC discretion arose out of a recognition that since the Act's drafters could not " 'include specific consideration of every evil sought to be corrected,' the absence of express remedial authority should not force the Commission 'to sit idly by and wink at practices that lead to violations of [the Act's] provisions.' " *Id.* (quoting *American Trucking Associations, Inc. v. United States*, 344 U.S. 298, 309–10, 311, 73 S.Ct. 307, 314–15, 97 L.Ed. 337 (1953)); *see also In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 654–57, 98 S.Ct. 2053, 2066–68, 56 L.Ed.2d 591 (1978) (ICC has necessary "ancillary" powers which are not specifically stated in its express statutory grant of authority to suspend tariffs); *United States v. Chesapeake & Ohio Railway Co.*, 426 U.S. 500, 514, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976) (ICC has power to condition railroad rate increases on requirement that railroads devote increased revenues to maintenance and capital improvements).

The Commission's discretionary remedial powers are not limited to the ratemaking area. For example, in *Amoskeag Co. v. Interstate Commerce Commission*, 590 F.2d 388 (1st Cir.1979), the court upheld an ICC order prohibiting Amoskeag Co., the owner of one railroad, from making a tender offer for shares of a second railroad. Despite the lack of a provision in the Act specifically empowering the ICC to act to prevent potential violations of the Act's prohibition against a person controlling two or more common carriers without prior ICC approval,[11] the court considered that the likelihood of a statutory violation, together with Amoskeag's previous commitment not to purchase the railroad's stock without Commission approval, supported the ICC's action. The court stated: "We do not cavil with Amoskeag's observation that the Commission is without authority to exercise power not entrusted to it by Congress. We do, however, quarrel with the suggestion that an explicit grant of power must underpin each such exercise." 590 F.2d at 392. The court held that the ICC was justified in "acting to protect the integrity of its jurisdiction." 590 F.2d at 393.

### B. Natco Revocation

■ In this case, the ICC's 1984 order terminating AAACon's operating authority was made pursuant to its power under 49 U.S.C. § 10925(b) to revoke a certificate for willful failure to comply with a Commission order. The Commission's decision was emphatic in its prohibition against AAACon's operation, finding that a revocation of AAACon's certificate was the only effective means of preventing the carrier's willful and repeated violations of the prior cease and desist order. The revocation order has been fully adjudicated, and cannot now be challenged collaterally.

The petitioners contend, however, that Zola's purchase of Natco was "open and lawful." They further contend that because Zola was not a party to the AAACon revocation proceeding, the Commission improperly used the AAACon revocation order as a basis for revoking Natco's certificate.

We disagree. The Commission's investigation and its revocation of Natco's certificate were well within the ICC's statutory

---

**11.** 49 U.S.C. § 11343 formerly codified at 49 U.S.C. §§ 5(2), (5), prohibits a person from acquiring two carriers without prior ICC approval.

authority. The Interstate Commerce Act gives the ICC the authority to "inquire into and report on the management of the business of" interstate carriers and of the business of a person "controlling, controlled by, or under common control with those carriers." 49 U.S.C. § 10321(b); *see also* 49 U.S.C. § 11701(a) ("The ... Commission may begin an investigation under this subtitle on its own initiative or on complaint.").[12] Thus, the Act clearly authorized the ICC investigation of both Natco, a motor carrier, and Zola, Natco's owner. *Cf. Comet Electronics, Inc. v. United States,* 381 F.Supp. 1233, 1241 (W.D.Mo. 1974), *aff'd without opinion,* 420 U.S. 999, 95 S.Ct. 1439, 43 L.Ed.2d 758 (1975) (Act empowers Commission to investigate nonparty railroad holding company). Once the ICC found, after notice, investigation, and an administrative hearing, that Natco was simply a continuation of AAACon, its revocation of Natco's certificate was an "appropriate action to compel compliance" with the Act and with the prior, fully adjudicated AAACon revocation order. 49 U.S.C. § 11701(a).

The evidence before the Commission was more than sufficient to support its finding that Natco was a successor to AAACon, and that both were under the direct control of Ralph Zola. This conclusion is evident from a review of only the main events in the AAACon–Natco metamorphosis. Zola negotiated for the purchase of Natco, an operationally defunct corporation, at a time when it was obvious that AAACon's certificate would be revoked. He instructed AAACon's employees and agents that under Auto Caravan they would be "in the same position" as they were under AAACon, "with zero changes." Resp. App. at 64. He engineered the Natco purchase so that it was concluded immediately upon revocation of AAACon's certificate. Finally, Natco carried on AAACon's activities without any significant changes in management, personnel, facilities, or operating procedures, except for changes necessarily associated with the business's new name. Given this background, the petitioners' contention that Natco's operating authority is unaffected by the Commission's order revoking AAACon's certificate is simply untenable.

Equally untenable is the petitioners' assertion that the Commission was required to pursue alternative judicial or administrative remedies in order to revoke Natco's certificate. After a full investigation and administrative hearing, the ICC determined that for all practical purposes Natco and AAACon are simply two names for the same enterprise. The propriety of the Commission's revocation of that enterprise's operating authority was fully and finally determined in the AAACon revocation proceeding. We see no basis in the Interstate Commerce Act or elsewhere for requiring the Commission to institute alternative or additional proceedings against Zola or Natco in order to enforce compliance with the fully adjudicated AAACon revocation order.

At the conclusion of the decision upholding the AAACon revocation order, Judge Wald reiterated the court's holdings that the order was procedurally correct and supported by substantial evidence. She observed that "AAACon's protracted journey through the Commission and the courts has finally come to a dead end." *AAACon,* 792 F.2d at 1165. Unfortunately, Judge Wald's prediction has been proven false, not because her court misinterpreted or misapplied the law, but because Zola has again demonstrated his propensity to violate and circumvent ICC orders. As Zola himself described it, Natco/Auto Caravan has emerged "like Phoenix" from AAACon's ashes to carry on its operations without any significant change in personnel, facilities, or operating procedures.

If the petitioners still have any lingering doubts about the meaning of the AAACon revocation order, or any plans for any further Phoenix-like recreations of the AAACon operation, we intend now to put those doubts and plans to rest. The unequivocal meaning and intent of that order was to

---

12. Furthermore, 49 U.S.C. § 10321(a) provides that "[e]numeration of a power of the Commission ... does not exclude another power the Commission may have...."

terminate AAACon's operating authority, and thus to bar it from continuing any of the transportation activities previously permitted under its certificate. By its terms, the order applies to AAACon Auto Transport, Inc. By necessary implication, it applies also to Zola, Natco, Auto Caravan, and to all other individuals or entities who intend to continue AAACon's operations under other auspices. We therefore uphold the Commission's revocation of Natco's operating authority, as well as its prohibition against Auto Caravan's interstate for-hire transportation activities.

### C. Zola Debarment

■ The ICC's order barring Zola from "directly or indirectly engaging in any transportation activities within the Commission's jurisdiction" is an extreme measure. Indeed, the order appears to be unprecedented in its scope (i.e., barring an individual from conducting *any* activities within the Commission's jurisdiction)[13] and in its indefinite duration. For the reasons discussed below, we conclude that debarment is an appropriate remedy, given the exceptional circumstances of this case. However, we also conclude that even the extraordinary nature of this case does not warrant a debarment order as broad as that issued by the Commission.

As we have already stated, a necessary corollary to the Commission's power to issue a revocation order under 49 U.S.C. § 10925 is the power to apply that order to a "new" carrier, owned and operated by the same individuals, which performs activities identical to those at issue in the revocation proceeding. The petitioners contend, however, that the Commission may not enforce its revocation orders by issuing a cease and desist order against a non-licensee, such as Zola, who was not named as a party in the initial revocation action.

Although we consider an agency's debarment of an individual to be an extreme

remedy for statutory violations and noncompliance with agency orders, we do not believe that debarment in this case is either unwarranted in law or without justification in fact. Congress has entrusted the Commission with the authority to amend, suspend, or revoke a motor carrier's certificate for willful failure to comply with the Act, an ICC order, or the terms of its certificate, 49 U.S.C. § 10925(b), and has further given the ICC the general authority to take appropriate action to compel compliance with the Act. 49 U.S.C. § 11701(a).

The petitioners argue that because § 11701(a) speaks in terms of "carrier[s] and broker[s]", the statute does not authorize orders directed at "non-licensees" such as Zola. However, the evidence before the Commission was more than adequate to support its conclusion that Zola at all relevant times directly controlled and managed, and indeed was the alter ego of Natco and AAACon. The record also establishes that Zola was directly responsible for the violation of the prior cease and desist and revocation orders issued against AAACon. In such a situation, the ICC's cease and desist order is fully consistent with the settled principle that, to give effect to its orders, an agency may take action against the individuals controlling the regulated corporation. *See Federal Trade Commission v. Standard Education Society*, 302 U.S. 112, 119, 58 S.Ct. 113, 116, 82 L.Ed. 141 (1937) (Commission properly included corporation's principals in its cease and desist order when its findings established that principals are likely to continue to attempt to evade its orders); *Mattes v. United States*, 721 F.2d 1125, 1131–32 (7th Cir.1983) (Department of Agriculture properly denied an application to operate a stockyard on the ground that the approval would have circumvented a suspension order entered against applicant's husband); *Bruhn's Freezer Meats of Chicago, Inc. v. United States Depart-*

---

**13.** We have some doubts about whether the Commission intended to bar Zola from engaging in *all* transportation activities within its jurisdiction, or whether it instead intended only to prohibit him from conducting "for-hire transportation activities," as specified in the Commis-

sion's "show cause" order, App. at 12, the order of the ALJ, *id.* at 31, and the Commission's decision. *Id.* at 51. However, because Zola is bound by the clear language of the Commission's final order, it is that language which we must consider.

*ment of Agriculture,* 438 F.2d 1332, 1343 (8th Cir.1971) (owners and officers of regulated corporation properly included in cease and desist order); *Sebastopol Meat Co. v. Secretary of Agriculture,* 440 F.2d 983, 985 (9th Cir.1971) (owner and alter ego of corporation properly included in cease and desist order); *Guziak v. Federal Trade Commission,* 361 F.2d 700, 704 (8th Cir. 1966), *cert. denied* 385 U.S. 1007, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967) (corporate principals properly included in cease and desist order).

Contrary to the petitioners' assertion, *Wallach v. Securities and Exchange Commission,* 202 F.2d 462 (D.C.Cir.1953), is not to the contrary. As the court explained in *Touche Ross & Co. v. Securities and Exchange Commission,* 609 F.2d 570, 580 n. 16 (2d Cir.1979), *Wallach* stands for the limited proposition that the S.E.C. may not discipline nonregistered salesmen of a registered broker-dealer, since the Securities Exchange Act had limited the SEC's suspension and revocation power to brokers and dealers. In this case, motor carriers such as Natco are expressly encompassed in the ICC's revocation authority, 49 U.S.C. § 10925(b), and the Commission is empowered to inquire into the business of persons such as Zola who control motor carriers. 49 U.S.C. § 10321(b). For the reasons stated above, we consider that the Commission's revocation power and its power to take appropriate action to compel compliance with the Act, 49 U.S.C. § 11701, furnish a sufficient statutory basis for the cease and desist order against Zola. We note also that the Act specifies that the enumeration of a power of the Commission does not exclude another power the Commission may have in carrying out the Act. 49 U.S.C. § 10321(a).

We are also persuaded that under the particular circumstances of this case, the debarment remedy constitutes an "appropriate action to compel compliance" with the Act. 49 U.S.C. § 11701. As recounted above, and as detailed in the prior administrative and judicial decisions involving AAACon and Natco, Zola's conduct has for years been characterized by extreme and—until now—successful attempts to flout the

Commission's orders and evade its jurisdiction. Given this individual's well established propensity to ignore what he regards as "annoying" ICC orders, the Commission was warranted in issuing a cease and desist against him that provides some assurance that he will not again attempt to circumvent the AAACon revocation order.

■ Although the debarment remedy is appropriate in this case, we do not believe that the scope and indefinite duration of the debarment order are rationally related to the Commission's legitimate goal of preventing this individual from once again resuscitating the AAACon enterprise. The Supreme Court has emphasized that in devising remedies for statutory violations, agencies and the courts have the duty "to give 'complete and efficacious effect to the prohibitions of the statute' with as little injury as possible to the interests of private parties or the general public." *Gilbertville Trucking Co. v. United States,* 371 U.S. 115, 130, 83 S.Ct. 217, 226, 9 L.Ed.2d 177 (1962) (quoting *United States v. American Tobacco Co.,* 221 U.S. 106, 185, 31 S.Ct. 632, 650, 55 L.Ed. 663 (1911)). Thus, "the choice of remedy is as important a decision as the initial construction of the statute and finding of a violation. The court or agency charged with this choice has a heavy responsibility to tailor the remedy to the particular facts of each case so as to best effectuate" the elimination of the statutory violation. 371 U.S. at 130, 83 S.Ct. at 226.

As presently stated, the order prevents Zola from "directly or indirectly" engaging in a variety of transportation activities, such as those involving distinct types of motor carriers, and railroad, pipeline, and water carriers, *see* 49 U.S.C. § 10501, *et seq.,* that are wholly unrelated to the automobile driveaway service at issue in the AAACon and Natco proceedings. It may be true that the record in this case provides little assurance that Zola presently intends to comply with the clear meaning of the AAACon revocation order. However, the prohibition against Zola's direct or indirect involvement in *any* ICC-regulated activity is simply too broad to be sustained. We

shall therefore vacate the order only insofar as it bars Zola from engaging in transportation activities that are wholly unrelated to the automobile driveaway service at issue in the Commission's proceedings against AAACon, Natco, and Zola. Since the ICC has the particular expertise necessary to devise an order sufficient to accomplish the objective of terminating the relevant activities of the AAACon/Natco enterprise, we shall remand this matter to the Commission for proceedings necessary for the entry of such an order.

### III. Conclusion

Insofar as ¶ 3 of the order under review prohibits petitioner Ralph J. Zola from conducting transportation activities that are wholly unrelated to those at issue in the prior proceedings against AAACon and in the present proceedings against Zola and Natco, the order will be vacated and the matter will be remanded to the ICC for the entry of an order consistent with Part II.C of this opinion. In all other respects, the petition for review will be denied. The stay of the Commission's order, with respect to all parts of the order except for the portion of ¶ 3 referred to above, is hereby lifted.